FILED

12:43 pm, Jul 22, 2020

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Roger A.G. Sharpe, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

BILLIE J. ALLEN,
          Petitioner
     -v-

WARDEN, FCC, TERRE HAUTE,
         Respondent,

CASE# 2:13-cv-00271-JMS-MJD

---

## MOTION TO RETURN TO REFILE A CORRECTED MOTION, PURSUANT 28 U.S.C. 2241

---

Petitioner Billie Allen (Allen), pro se, moves to return to this Court to refile a corrected motion, pursuant 28 U.S.C. 2241; challenging the unconstitutionality of Allen's confinement, custody, charges, conviction, and continued execution of Allen's unconstitutional sentence as a prisoner on Federal Death Row. Where said confinement, custody, charges, conviction, and continued execution of Allen's unconstitutional sentence is in clear violation of the Fifth Amendment's demand that "[n]o person", including Allen, "shall be held to answer for a capital [] crime, "unless" on a presentment, or an indictment of a Grand Jury," (quoting U.S. Const. amend. V) (emphasis added), and the Sixth Amendment's demand that Allen must "be informed of the nature and cause of the allegation[s]" against him. (quoting U.S. Const. amend. VI). Thus, requiring Allen's immediate or a speedy release.

### BACKGROUND BEHIND RETURN TO REFILE

Allen submits that on July 19, 2013, this Court received a pro se motion; (Case# 2:13-cv-00271-JMS-MJD Doc.#1), asking this Court, "in the interest of justice", to allow Allen to proceed pro se to challenge his unconstitutional confinement, custody, conviction, and the continued execution of Allen's unconstitutional sentence. All of which spawned from the violation of Allen's Fifth and Sixth Amendment rights.

On Aug. 7th, 2013, Allen would also ask this Court, "in the interest of justice", and due to the complexity of the issue(s) presented, for the Court to appoint counsel to aid and assist him[1] in the presentment of the claims.

On Aug. 14, 2013, the respondant's would file a motion to dismiss. But on Aug. 16, 2013, the Court would respond by granting Allen's motion for the assistance of counsel and state that counsel could assist Allen throughout the filing(s).

---

1  Allen made the request for counsel because his "counsel of record", dispite the merits of the claim, refused to aid and assist him. Thus, leaving Allen without counsel to help in a critical situation, for a critical issue.

1

On Nov. 8, 2013, a few months after the Court appointed counsel, and before the date when the Court had scheduled Allen to file his motion. Upon counsel's "advice", but against Allen's better judgment, Allen would be convinced by counsel to withdraw the motion pursuant 2241, and would do so without prejudice. To which the Court would then grant the motion to withdraw the 2241 motion, without prejudice.

Allen now moves to return to this Court, "in the interest of justice", to refile a corrected 2241 motion; challenging the unconstitutionally of his confinement, custody, conviction, and the continued execution of his unconstitional sentence. And in doing so, Allen asks this Court for  appointment of counsel to aid and assist him moving forward.[2]

## PRELIMINARY STATEMENT

Both the government and the Eighth Circuit have and continue to concede that the indictment submitted to Allen's Grand Jury (APPENDIX A), by the government, "cannot be reasonably construed to charge a [single] statutory aggravating factor, [or capital mens rea] 'as required for imposition of the death penalty', [and] it is 'constitutionally deficient to charge a capital offense.'" United States v Allen, 357 F.3d 745,747 (8th Cir. 2004) (emphasis added). While also conceding that "'it is clear' that Allen's indictment suffers a Fifth Amendment defect." United States v Allen, 406 F.3d 940,943-44 (8th Cir. 2004) (emphasis added). Because, "[t]he prosecutor 'did not ask the grand jury to charge the [grave risk of death to others] statutory aggravating factor'", Id. at 762 (Hanson,J., dissenting), nor the required capital mens rea, for imposition of a non-capital case indictment, proceedings, charges, and punishment to be enhanced to those that are capital in nature and effect.

But dispite the Eighth Circuit and the government conceding to the Constitutional violations, the defects in Allen's indictment, the indictment being deficient for Allen's proceedings, charges, and Allen's  punishment to go outside of the indictment's text, and it was a deprivation of Allen's Constitutional rights as a result. All of which made Allen's proceedings, charges, and punishment immune from being capital in character and effect. Both the Eighth Circuit and the government would "guess" that "if the grand jury 'had been asked to charge the grave-risk-of-death-to-others statutory aggravating factor'", and capital mens rea for imposition of capital case proceedings , charges, and possible capital punishment for Allen, that the grand jury "would have done so." Id. at 948 (emphasis added). Then, the Eighth Circuit would hold the violations "harmless."

Yet, even if the Eighth Circuit and the government believed that their assumptions

---

2 Allen again asks this Court to appoint counsel to aid and assist him, being that his counsel of record have refused to aid and assist him in the filing of this motion. But if the Court reads this motion  and sees the merits of the claim presented, the Court will see that there's no reason why counsel of record shouldn't have aided Allen.

and their guesses as to what the grand jury "would have done". Neither the Eighth Circuit nor the government has the Constitutional jurisdiction to take on the role of the grand jury, guess what evidence the grand jury didn't or did consider, and/or then authorize the amended proceedings, charges, and punishment for Allen to be enhanced from non-capital to capital. See Costello v United States, 350 U.S. 359,362-63 (1956) ("No case has been cited, 'nor have we been able to find any furnishing an authorization for "looking into and revising the judgment of the grand jury" upon the evidence.'") (emphasis added) (quoting United States v Reed, 2 Blatchf. 435, 27 Fed. Cas. 727,738, F. Cas. No. 16134 (C.C.N.D.N.Y. (1852)) (emphasis added); United States v Dionisio, 410 U.S. 1,16-17 (1973) (Holding that an indictment by a grand jury "presupposes an investigative body 'acting independently of either prosecuting attorney or judge.'") (emphasis added); United States v Calandra, 414 U.S. 338, 343 (1974) ("'No judge' presides to monitor [the grand juries] proceedings.") (emphasis added); see also Vasquez v Hillery, 474 U.S. 254,263 (1986) (Holding that only "[t]he grand jury [decides to] charge a greater offense or a lesser offense; numerous counts or a single count; 'and perhaps most significant of all, a capital offense or a noncapital offense--all on the basis of the same facts.'") (emphasis added).

So, if the prosecutor; the indictment's draftsman wasn't satisfied with the para- meters within which they confined their indictment; its allegations, its elements, its proof, its charges, and the possible punishment for Allen to. They were under no obligation to **sign the return** for what they asked the grand jury to allow them to prosecute and charge Allen with in the indictment they drafted. See United States v Batchelder, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before the grand jury are decisions that generally rest in the prosecutor's descretion.")

But once the prosecutor decided to **sign the return,** and in doing so limited the allegations, purported facts, elements, evidence, charges, and possible punishment to not stray beyond the indictment's reach. Then, "its charges may not be broadened through amendment except by the grand jury itself." Stirone v United States, 361 U.S. 212,215-16 (1960); see also Russell v United States, 369 U.S. 749,770 (citing ex parte Bain, 121 U.S. 1 (1887) (internal citation omitted) (For it is a "'settled rule in the Federal Courts' that 'an indictment may not be amended except by resubmission to the grand jury.'") (emphasis added).

Yet, in Allen's case, after the indictment was returned, after the return was signed by the prosecutor, but before the trial was conducted. The prosecutor, in a "stealth maneu- ver", filed a Notice Of Intent To Seek The Death Penalty Against Allen (APPENDIX B), pursuant

3

to 18 U.S.C. 3593(a) that set forth both the statutory aggravating factors contained in 18 U.S.C. 3592(c) and the capital mens rea required from 18 U.S.C. 3591(a)(B), to amend Allen's non-capital case indictment, proceedings,charges, and possible punishment to be enhanced to those of a capital nature. When "the indictment "must" contain 'an allegation of every fact which is legally essential to the punishment to be inflicted.'" United States v Reese, 92 U.S. 214,232-33 (1885) (Clifford, J., dissenting)(emphasis added).

And with the statutory aggravating factors "opperat[ing] as the functional equivalent of 'an element of a greater offense,'" Ring v Arizona, 536 U.S. 584,609 (2000) (quoting Apprendi v New Jersey, 530 U.S. 466,494 (2000), which broadened the basis for conviction and punishment from that which appeared in the indictment. See Allen, 406 F.3d, at 943-44 ("The Government had included these factors and the mens rea requirment in its notice of intent to seek the death penalty, 'but they were "not charged" in the indictment.'") (emphasis added). It then fell under the Fifth Amendment's demand that "[n]o person," including Allen, "shall be held to answer for a capital . . . crime, "unless" on a[n] . . . indictment of a Grand Jury", as well as the Sixth Amendment's demand that Allen "be informed of the nature and cause of the accusation" agaisnt him. And "must appear in the indictment." Jones v United States, 526 U.S. 227,243 n.6 (1999) (emphasis added).

Moreover, unlike cases where no objection would be made to such a violation, and tardily challenged indictments are construed liberally in favor of validity. See United States V Watkins, 709 F.2d 475, 478 n.2 (7th Cir. 1983) (citing United States v Pheaster, 544 F.2d 353 (9th Cir. 1976) Allen, before trial, and before the structural "defect affect[ed] the framework within which" Allen's "trial proceed[ed]," Arizona v Fulminante, 499 U.S. 279, 309-10 (1991), would object to his non-capital case proceedings, charges, and possible punishment being unconstitutionally and constructively amended to those of a capital nature. See (E.D. Mo. Case# 4:97-cr-00141-ERW Doc.# 172). Being that a constructive amendment is reversible per se if the defendant raised the proper objection before the trial court. See United States v Remsza, 77 F.3d 1039,1043 (7th Cir. 1996); see also Weaver V Massachusetts, 137 S.Ct. 1899,1910 (2017) ("Thus, in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal,[3] the defendant generally is entitled to 'automatic reversal regardless of the error's actual effect on the outcome.'") (quoting Neder v United States, 527 U.S. 1,7 (1999). And when " a structural error 'is preserved and raised on direct appeal', the balance is in the defendant's favor, and 'a new trial generally will be granted as a matter of right.'" Weaver, 137 S.Ct. at 1914.

---

3 Allen objected to the trial court and would also raise the claim on direct appeal

4

Though put on notice that Allen's "indictment suffer[ed] a Fifth Amendment [structural] defect," Allen, 406 F.3d at 943, and dispite giving the prosecutor; the indictment's draftsman every opportunity to seek a superseding indictment that would allow the government a chance to "constitutionally amend" Allen's indictment to charge Allen with the statutory aggravating factors and the capital mens rea; for imposition of capital case proceedings, charges, and a possible capital sentence for Allen. See United States v Pennington,[4] 2003 U.S. Dist. LEXIS 24478 No. 3:01-cr-35-R, Slip op. at 3 (W.D. Ky. Feb. 21, 2003) (APPENDIX C) (granting defendant's motion to preclude imposition of the death penalty where the indictment did not allege death-qualifying statutory aggravating factors or the requisite mens rea, and the government did not seek a superseding indictment prior to jeopordy attaching. Notwithstanding the acknowledged mandate from the Attorney General to seek a superseding indictment "in all pending Federal Death Penalty cases" so as to include the requisite intent and statutory aggravators.); see also United States v Regan, 221 F.Supp. 2d 672,675 (E.D. Va. 2002) (Noting in light of Ring v Arizona, the government filed a superseding indictment "re-alleging" espionage charges "and including the statutory aggravating factors previously set forth "only" in the the notice of intent to seek the death penalty."

Instead of seeking a superseding indictment against Allen, the government, forewarned beforehand; first, by the Fifth and Sixth Amendment's demands that "[n]o person", including Allen, "shall be held to answer for a capital [] crime, "unless" on a[n] indictment of a Grand Jury", and that Allen must "be informed of the nature and cause of the allegation[s]" against him, (quoting U.S. Const. amend. V. and VI); and second, by Allen's objection to the structural defect in Allen's indictment before trial, would instead choose to proceed forward with its case against Allen, knowing that a violation was leading the way.

Yet, by proceeding forward with their case against Allen, the government would constructively amend Allen's indictment; through its use of the statutory aggravating factors that were intentionally omitted from Allen's indictment; which in themselves contained additional and different offenses that were legally and essentially relevant when proved at trial, were not fully contained in Allen's indictment, and as a result, trial evidence would amend the indictment by broading the possible bases for a conviction from that which appeared in the indictment's allegations, purported facts, elements, evidence, and charges. Which would allow Allen to be convicted for a criminal plan broader than, but not fully included within Allen's actual indictment, and was a "fatal error."

---

4 It should be noted that the Court in Pennington would specifically adrress the Eighth Circuit's dismissal of Allen's Fifth Amendment violation by stating that "Penningting, however, does enjoy the protections of the Fifth Amendment's Grand Jury Clause, as did Allen."

5

See Stirone, 361 U.S. at 218-19 ("The right to have the grand jury make the charge 'on its own judgment is a substantial right' which cannot be taken away with or without court amendment . . . [and] 'because of the court's admission of evidence and under its charge this "might" have been the basis upon which the trial jury convicted petitioner.' If so, 'he was convicted on a charge the grand jury never made against him.' This was 'fatal error.'") (emphasis added).

The facts presented show that Allen's custody, conefinement, and the continued execution of Allen's sentence(s) are "all unconstitutional", because they were obtained "in violation of the Constitution or laws [] of the United States", Samirah v O'Connell, 335 F.3d 545,549 (7th Cir. 2003), and Allen requires immediate and/or a speedier release. Or, "a new trial" should be granted "as a 'matter of right.'" Weaver, 137 S.Ct. at 1914 (emphasis added).

## ARGUMENT

### ALLEN'S INDICTMENT WASN'T SUFFICIENT FOR ALLEN TO BE "HELD TO ANSWER FOR" PROCEEDINGS, CHARGES, AND A PUNISHMENT THAT WAS CAPITAL IN CHARACTER

While it is true that an indictment is not required to "detail every factual nugget necessary for conviction", nor "is it required to allege in detail the factual proof that will be relied on to support the charges" that are charged in the indictment. United States v Smith, 230 F.3d 300,306 (7th Cir. 2000). An indictment "must be plain, concise, and a definite written statement of the 'essential facts constituting the offense[s]'", (quoting Fed. R. Crim. P. 7(2)(1)) (emphasis added) that are actually charged in the indictment and will be proved at trial.

To be "sufficient", the "indictment 'must contain [] the elements of the offence[s] charged'", Hamling v United States, 418 U.S. 87,117 (1974) (emphasis added), in order to satisfy the Fifth Amendment's demand upon prosecutors and court's that "[n]o person", including Allen, "shall be held to answer for a capital [] crime, "unless" on a[n] indicment of a Grand Jury." (quoting U.S. Const. amend. V) (emphasis added). Then, it must provide "enough factual particulars to 'sufficiently apprise' the defendant of what he "must be prepared to meet"" at trial, Russell, 369 U.S. at 763 (emphasis added), in order to satisfy the Sixth Amendment's demand on prosecutor's and court's that all defendants, including Allen, "be informed of the nature and cause of the accusation[s]" against them. (quoting U.S. Const. amend. VI). For, the most basic of due process's customery protections is the "demand of fair notice." See Connally v General Constr. Co., 269 U.S. 385,391

6

(1926); see also Note, Textulalism as fair Notice, 123 Harv. L. Rev. 542,543 (2009)("From the inception of Western of Western culture, fair notice has been recognized as the essential element of the rule of law.") Because indictment's had to provide "precise and sufficient certainty" about the allegations and charges involved. 4W. Blackstone, Commentaries on the Laws of England, 301 (1769) (Blackstone) (emphasis added).

In Allen's case, the prosecutor; the indictment's draftsman would submit to Allen's grand jury a very narrow and very limited set of allegations, purported facts, elements, evidence, and charges within an indictment carrying (2) seperate Counts. The indictment's text on both Counts show that the principal allegations, purported facts, elements, evidence, and charges were limited to the "bank robbery", "knowingly used and carried a firearm during and in relation to a crime of violence . . . 'that is, bank robbery as alleged in Count 1'", (emphasis added), the "unlawful killing of [the bank security guard] Richard Heflin" (Heflin), on the date of "March 17, 1997", and would all stay within the parameters of the four walls "of the Lindell Bank and Trust Company." (quoting indictment; Counts 1 & 2).

The principal allegations, purported facts, elements, evidence, and charges listed above, or read in their entirety from the indictment's text itself sufficiently "informed [Allen] of the nature and cause of the accusation[s]" against him, and informed Allen of what he was going to "be held to answer for" at trial. (quoting U.S. Const. amend. V & VI). Which Allen concedes to for only the following reasons.

First, the indictment was sufficient enough for the government's case-in-chief; its allegations, purported facts, its elements, its evidence, aand its charges to stay within the narrow parameters of the indictment's text. Where at that point; after the grand jury returned the indictment; after the return was signed; and before a single proceeding  for Allen had started. The government had not infringed upon Allen's Fifth nor Sixth Amendment rights.

Second, because of the indictment's text, which omitted the statutory aggravating factors and capital mens rea, it was only sufficient for all of Allen's proceedings, charges, and any possible punishment that Allen "must be prepared to meet", Russell, 369 U.S. at 763, to be non-capital in nature and effect. Which Allen concedes to, and both the government and the Eighth Circuit have also conceded to, when they stated that "it is clear that 'Allen's indictment suffers a Fifth Amendment defect'", Allen, 406 F.3d at 943-44 (emphasis added), that Allen's indictment "cannot be 'reasonably construed to charge a [single] statutory aggravating factor [or capital mens rea,] 'as required for imposition of the death penalty', [and] it is 'constitutionally deficient to charge a capital offense.'" Allen, 357 F.3d at 747 (emphasis added).

the Fifth Amendment demands upon both prosecutors and courts that "]n]o person", including Allen, "shall be held to answer for a capital [] crime, "unless" on a[n] . . . indictment of a Grand Jury". Both the government and the Eighth Circuit have and continue to concede that "it 'is clear' that Allen's indictment suffers a Fifth Amendment defect", Id. at 943-44 (emphasis added), and Allen's indictment "is 'constitutionally deficient to charge a capital offense.'" Id. at 747 (emphasis added).

Yet, how is it that Allen is actually being "held to answer for a capital [] crime", (quoting U.S. Const. amend. V), when Allen's indictment "is 'constitutionally deficient to charge a capital offense?'" Id. at 747 (emphasis added). And these facts in themself show that Allen's custody, confinement, charges, and the continued execution of Allen's sentence(s) are all unconstitutional. Because they were all obtained and/or conducted "in violation of the Constitution or laws [] of the United States", Samirah, 335 F.3d at 549, and Allen requires an immediate and/or speedier release. Or, "a new trial" should be granted to Allen "as a 'matter of right.'" Weaver, 137 S.Ct. at 1914 (emphasis added).

## THE INTRODUCTION OF THE STATUTORY AGGRAVATORS INTO THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY AFFECTED THE FRAMEWORK WITHIN WHICH ALLEN'S TRIAL PROCEEDED

The required statutory aggravating factors and capital mens rea; for imposition of the death penalty, were omitted from Allen's indictment. Thus, constitutionally demanding upon the prosecutor and court that Allen "shall [not] be held to answer for a capital [] crime", (quoting U.S. Const. amend. V), and further ensuring that Allen's proceedings, allegations, elements, evidence, charges, and punishment would be immune for being capital in character and effect. Because "[t]he prosecutor 'did not ask the grand jury to charge the statutory aggravating factor[s]'", Allen, 357 F.3d at 762 (emphasis added), See Allen, Id. at 747 (Concluding Allen's indictment "is constitutionally deficient to charge a capital offense."), and since the grand jury returned the indictment on the narrow and limited text within the indictment and the government would sign the return. Then Allen's "charges [and punishment] may not be broadened through amendment except by the grand jury itself." Stirone, 361 U.S. at 215-217.

But it wasn't until after the indictment, after the return was signed, when, for the first time, the government would introduce the omitted from Allen's indictment; statutory aggravating factors and capital mens rea into a Notice Of Intent To Seek The Death Penalty Against Allen. Where said Notice Of Intent To Seek The Death Penalty would not only come with legally relevant and legally essential, if proved, additional and different allegations, purported facts, proof/evidence, elements, and charges that the government

8

would acknowlegde in the Notice Of Intent To Seek The Death Penalty that "[t]he Government propose[d] to prove" at Allen's trial. (quoting Notice Of Intent To Seek The Death Penalty) But even before Allen's trial : began, the Notice Of Intent To Seek The Death Penalty "affect[ed] the framework within which [Allen's] trial proceed[ed], rather than simply an error in the trial process itself", and as such "defy[s] analysis by harmless error standards." Arizona v Fulminante, 499 U.S. 279,309-10 (1991) As shown in the following.

Allen's arraignment, (went from one where a plea of not guilty would've topped any sentence at a life sentence or less, See Pennington, 2003 U.S. Dist. LEXIS 24478 (6th Cir. 2003); defense counsel, (went from one who was only required to have trial experience, to one who was mandated to have trial and capital case experience); defense counsel's strategy, (went from only having to focus on the guilt/innocence phase, to having to prepare for the guilt/innocence phase, the penalty phase, and then having to decide which way to better use the limited time and resources); the prosecutor, (went from only having to focus on the guilt/innocence phase, to having to prepare for guilt/innocence and the penalty phase); the judge, (went from only having to make rulings and giving orders on motions, briefs, etc. that would be all non-capital in nature and effect, to having to make rulings and giving orders that addressed and impacted capital cases issues, proceedings, evidence, elements, charges, and a life and death sentence); the jury questionnaires, (went from being limited to basic-non-capital case questions, to the questions specificly asking the jurors about their personal stance on the death penalty and their being able to take a life through the use of lethal injection); the jury members, (went from one that was a "regular jury", to being a "death-qualified jury"); the trial, (went went from one that could only charge and present the allegations, purported facts, elements, proof/evidence, and charges within the indictment's text, to being one that was enhanced and/or amended; through the statutory aggravating factors within the Notice Of Intent To Seek The Death Penalty, that broadened the possible basis for conviction and a possible punishment which appeared and was asked for in Allen's actual indictment); jury instructions, (went being limited to the jury deliberating only the allegations, purported facts, elements, evidence, and charges that were in the actual indictment's text, to the jury also deliberating additional and different allegations, purported facts, elements, evidence, and charges omitted from the indictment but presented in the Notice Of Intent To Seek The Death Penalty); the verdict, (went from one that would be limited to the charges in the indictment, to one that would initiate another phase of proceedings that Allen's grand jury didn't authorize); the penalty phase, (which should have never been an option, to one where both the government and the court guessed the grand jury would've authorized, "had they been asked" and would end with Allen receiving a death sentence that his indictment nor the grand jury authorized to be used against him).

This fair and reasonable analysis of how the Notice Of Intent To Seek The Death Penalty Against Allen shows how the "defect affect[ed] the framework within which [Allen's] trial proceed[ed], rather than simply an error in the trial process itself", and that it is clear it "defy[s] analysis by harmless error standards." Id. at 309-10. Thus, further showing that Allen's custody, confinement, charges and the execution of Allen's sentence(s) are all unconstitutional. Because they were all obtained and/or conducted "in violation of the Constitution or laws [] of the United States", Samirah, 335 F.3d at 549, and Allen requires an immediate and/or speedier release. Or, "a new trial" should be granted to Allen "as a 'matter of right.'" Weaver, 137 S.Ct. at 1914 (emphasis added).

## ALLEN'S INDICTMENT WAS CONSTRUCTIVELY AMENDED

The government's Notice Of Intent To Seek The Death Penalty wasn't just an information, where Fed. R. Crim. P. 7(e) concludes, an information can be amended at any time before the verdict or finding "as long as an additional or different offense" is not charged, or the "substantial right of the defendant" is not prejudiced. Because from the beginning; upon seeking an indictment against Allen, the prosecutor; the indictment's draftsman intent was to present against Allen, at Allen's trial, legally relevant and legally essential, if proved, additional and different allegations, purported facts, evidence, elements, charges and a punishment that would all be "greater in degree than that described in the definition", See(4:97-cr-00141-ERW Doc.#503 pg.501 (March 9, 1998))(emphasis added), and/or "greater in degree" than what the government sought in the indictment itself.

All of the legally relevant and legally essential, if proved, additional and different allegations, purported facts, evidence, elements, and charges that were "greater in degree", and that the prosecutor would acknowledge in The Notice Of Intent To Seek The Death Penalty that "[t]he Government 'proposes to "prove"'" at Allen's trial, (quoting The Notice Of Intent To Seek The Death Penalty), were not fully containted in the indictment. This, dispite the proposition that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him," Stirone, 361 U.S. at 217, and therefore, that "after an indictment has been returned its charges may not be broadened[5] through amendment except by the grand jury itself." Id. at 215-16.

But as promised, from what "[t]he Government propose[d] to prove" at Allen's trial, the government would amend the indictment by broadening the possible bases for conviction to include a criminal plan broader than, but not included within the crime and plan set forth in the indictment. And using those same legally relevant and legally essential, if

---

[5] Allen, before trial, would make a timely objection to the Notice Of Intent To Seek The Death Penalty, and to his proccedings, charges, and punishment being amended after the indictment was returned.

proved, additional and different allegations, purported  facts, evidence, elements, and charges to prove an earlier and later than operative timeline that wasn't alleged nor charged in Allen's indictment.

To acheive the amendment, by broadening the possible bases for conviction to include a criminal plan broader than, but not included within the crime and plan set forth in the indictment, in opening statements, the prosecutor would tell Allen's jury the following;

"This ladies and gentlemen, is what the Government's evidence will be ..."(pg.2); "'at least since December of 1996'Norris Holder and this defendant, Billie Allen were aquantances." (emphasis added)(pg.5); "Both of them, 'during the time period between fall of 1996 and March of 1997', on several occasions watched a movie called "Set It Off" (emphasis added) (pg.6); "During the week 'or 10 days before the robbery of the Lindell Bank and Trust Company', the 'evidence is going to show you that this man [Allen] and Norris Holder began to make their final plans to rob Holder's own bank'" (emphasis added) (pg.6-7); "To avoid detection there would be not one, there would be not two, 'there would be three seperate getaway cars.' They would drive to the bank in one getaway car, 'drive that to Forest Park where they would burn the first getaway car, destroying all evidence. They would then get into a second getaway car which would then take them a short distance to the Barnes Hospital garage where Holder's own vehicle was waiting to drive them to safety.'" (emphasis added) (pg. 7-8); "The evidence is going to show you, ladies and gentlemen, that they went substantially beyond talking about the crime, 'and in the days before the robbery on March 17 they began to actually prepare for it.'" (emphasis added) (pg.8); "The evidence 'is going to show you that they continued their planning on that very date [March 13, 1997], and went to Kiosk, a little shop in St. Louis Center, just a few blocks from here, and there he [Holder] purchased for about $300, an armored vest, body armor, a bullet-proof vest. With him when he made the purchase was this man (indicating Allen)' (emphasis added) (pg.9); "'That Saturday night before the robbery', Holder and Allen were at a bowling alley, North Oaks Bowl in North St. Louis county." (emphasis added) (pg.10); "That night 'between sunset on the evening of March 16, and the sunrise on the morning of March 17, two vans were stolen from seperate areas in the south part of the City of St. Louis. A blue Chevelet Astrovan. . ., also during that night a blue with wood side Dodge Caravan.'" (emphasis added) (pg.14); "The next morning Holder picks Allen up, driving one of these stolen vans, the Chevelet Astrovan. 'He gives Allen the Chinese SKS'" (pg.15); "The evidence is going to show you, ladies and gentlemen, at that time they had over 200 rounds of ammunition at their disposal. 'The evidence is going to show you that "all three firearms" that Wayne Ross saw 'the day before' in Holder's bedroom, 'were involved in this crime.' Not only did Holder have the Russian SKS, 'Billie Allen had the Chinese SKS, but the sawed-off - -no, not sawed-off,

the shotgun, 12gauge shotgun with pistal grip, that was put fully loaded in the second get-away car, the Dodge Caravan, which was left in Forest Park'" (emphasis added) (pg16); "Take-over robberies are by nature 'different than any other kind of bank robbery'," (emphasis added) (pg.19); "The evidence is going to show you . . . as [MR. West] dove 'the shooter [Allen[ shot at Mr.West also, shooting both below his feet and over his head, barely missing him.'" (emphasis added) (pg.21-22); "The evidence will show you the man running away,'who gets away from the burning van for a time at least, is this defendant, Mr. Allen.'" (emphasis added) (pg.28); "The evidence is also going to show you 'that between the time the defendant left the van and got to the forestry area, he apparently got rid of one of the heavy pieces of bulky clothing that he was wearing, it's a black leather jacket. . . '. When the police find this black jacket, its got 50 rounds of ammunition 'that will "only" work in the Chinese SKS' and it's got three shotgun shells that will fit the 12-guage shotgun that's waiting in the second getaway van.'" (emphasis added) (pg.30); "While these things were taking place in the bank, the crime scene investigation inside the bank, 'the van cont-inued to burn in Forest Park cooking off all this ammunition.'" (emphasis added) (pg.35); "In between the place where the van burned and where this man was seen talking to park employees, they found his leather jacket. In a pocket of his leather jacket, 50 rounds of ammunition 'designed to work in the Chinese SKS', three rounds of 12 gauge ammunition 'designed to work in the shotgun in the second getaway van.'" (emphasis added) (pg.35-36); "The evidence is going to show you . . . [t]he black leather jacket that was picked up betw-een the burned van and where Allen talked to the forestry workers, similary had the same kind of burned plastic on the back of it." (pg.39);

A "[c]onstructive amendment of the indictment can occur when [ ] the government (usually during its presentation of evidence and/or its argument). . . broaden the possible bases for conviction beyond those presented by the grand jury." United States v Jones, 418 F.3d 726,729 (7th Cir. 2005) (quoting United States v Cusimano, 148 F.3d 824,829 (7th Cir. 1998)). And its apparent from the government's argument to Allen's jury, that "what the Government's evidence w[ould] be"against Allen, during their presentation of said evidence, would constructively amend Allen's indictment by broadening the possible basis for conviction to include a criminal plan broader than, but not included within the crime and plan set forth in Allen's indictment. Which would include legally relevant and legally essential, if  proved, additional and different allegations, purported facts, evidence, elements, and charges for an earlier and later than operative timeline that wasn't alleged in Allen's actual indictment.

Now, when looking at the narrow, at times vague, and limited in its parametrs; indic-ment, that was submitted to Allen's grand jury, returned by the grand jury on what was

sought,          signed off on by the prosecutor, with the assurance that the indictment "informed [Allen] of the nature and cause of the allegation[s]" against him (quoting U.S. Const. amend. VI), and that what was in the indictment was all Allen would "be held to answer for." (quoting U.S. Const. amend. V). Thus, limiting the indictment's reach to not stray in the least from the indictmet's allegations and charges. It then becomes impossible to infer, guess, anticipate, or for anyone, especially Allen, to take anything from Allen's indictment that would suggest that allegations, evidence, and even charges of an earlier and later than operative timeline, for a crime and plan, would be presented against Allen. When "[f]rom the inception of Western culture, fair notice has been recognized as the essential element of the rule of law." Note, Textulalism as fair Notice, 123 Harv. L. Rev. 542, 543 (2009). Because indictment's had to provide "precise and sufficient certainty" about the allegations and charges involved.  4W. Blackstone, Commentaries on the Laws of England, 301 (1769) (Blackstone).

First, Allen's indictment would be concise when it specifically limited the operative timeline for the "nature and cause of the allegation[s]" to be on "March 17, 1997". (quoting indictment). Yet, the prosecutor, at Allen's trial, when making his argument to Allen's jury in his opening statement, would then tell the jury"what the Government's evidence w[ould] be", would indeed constructively amend the parameters of the indictment's operative timeline to be; "during the time period between fall of 1996 and March of 1997", "during the week or '10 days before the robbery.'"; "days before the robbery"; "on that very date" [March 13, 1997]; "That Saturday night before the robbery" [march 15, 1997]; "Between sunset on the evening of March 16", and even "after the robbery" in "Forest Park."

But neither Allen's indictment, nor the vague Notice Of Intent To Seek The Death Penalty suggests, infers, or would allow Allen an opportunity to anticipate that he should have to mount a defense or that there would be a need for an investigation into "the nature and cause of accusation[s]" against him. (quoting U.S. Const. amend. VI). Or what he would "be held to answer for" (quoting U.S. Const. amend. V) :    would be an amended timeline "during the time period between fall of 1996 and March of 1997, instead of "March 17, 1997"; as alleged and charged in the indictment.

Because it wasn't until the day of trial, when the prosecutor stood in from of the jury, thanked them for their attendance, gave his opening statement's, and then made allegations and told the jury that he would be presenting evidence of an earlier and later than operative timeline[6]. And would then also give Allen his first notice of "what the Government's

---

6 "[W]hat the Government's evidence w[ould] be", to prove the earlier and later than operative timeline, they would allege and charge, not limited to; months of alleged planning;

evidence w[ould] be." When "[t]he possible bases for conviction are limited to those contained in the indictment. . . New ones may not be added without resubmitting the indictment to a grand jury whether they are added literally, by a formal amendment to the indictment or constructively-by proof at trial of a crime not clearly and fully charged. . . which would allow a conviction on grounds not charged by a grand jury." United States v Leichtnam, 948 F.2d 370,379 (7th Cir. 1991); see also Stirone, 361 U.S. at 217 ("[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him.").

Second, Allen's indictment would only allege and charge that "Billie Jerome Allen . . . 'knowingly used and carried a firearm' 'during and in relation to a crime of violence' which may be prosecuted in a court of the United States, "'that is'", 'bank robbery' as alleged in Count 1 of this indictment." (quoting indictment) (emphasis added). With "'that is'", being the key expression that would limit the amount of firearms that Allen was actually indicted for, could be charged with, and when, and/or in what manner the jury could be told that the firearm was allegedly "used and carried."

"'That is'", (emphasis added), used as it was in Allen's indictment limited the firearm allegedly used and carried by Allen to only be a firearm specifically "used and carried in relation to . . . ,"'that is'", 'bank robbery' as alleged in Count 1." Which could then only be either the Chinese SKS and/or the Russian SKS. Because "that is" operated in the exact manner and has the same legal effect of the words "to wit", and made whatever follows an essential element of the offense in which the firearm was alleged to have been "used and carried." See United States v Willoughby, 27 F3d 263,266 (7th Cir. 1994) ("'To wit' is an expression of the limitation which, as our cases indicate, makes what follows an essential part of the charged offense.").

The jury instructions would further limit the amount of firearms that Allen was actually indicted for, could be charged with, and when, and/or in what manner the jury could be told that the firearm was allegedly "used and carried." With jury instruction number 20 stating that "[t]he phrase "used and carried", means that the firearm was actually 'employed in the course of the commission of the bank robbery.' You may find that a firearm was used

---

months of alleged meetings bewteen Holder and Allen; Allen allegedly watching a movie with Holder to plot the crime; Allen allegedly with Holder inside the bank while Holder cashed his check; Allen allegedly with Holder when Holder bought a bullet-proof vest to be used in the crime; Allen allegedly with Holder stealing (2) vans to be used in the robbery; Allen allegedly with Holder, before the robbery, miles away, where Holder allegedly gave Allen the Chinese SKS ; Allen allegedly posessing the Chinese SKS and the shotgun. Where Allen would make a timely objection, and where it was impossible for Allen to know that he would have to mount a defense, or investigate facts of an earlier timeline, when he was never "informed of the nature and cause of the allegation[s]" against him, in relation to the earlier timeline."

14

during the commission of the bank robbery if you find that it was brandished, displayed, or fired. (APPENDIX D ) (quoting jury instruction #20) (emphasis added); jury instruction number 22 stating "[t]he phrase "used a firearm" means that 'the firearms was actively employed in the course of the commission of the bank robbery.' You may find that a firearm was used during the commission of the robbery 'if you find that it was brandished, displayed, or fired.'" (APPENDIX E )(quoting jury instruction number 22) (emphasis added); and jury instruction number 25 stating that "[t]he phrase "carries a firearm" means 'to bear the firearm on or about the person' so long as 'it is located in such proximity to the person as to be convenient of access and within reach.'" (APPENDIX F) (quoting jury instruction number 25) (emphasis added). All of which, along with the indictment's text, would forbid any allegations or the introduction of any other firearms except the Russian SKS and/or the Chinese SKS. Because the Russian SKS and the Chinese SKS were the only firearms "used and carried" . . . "in relation to". . . "'that is'", 'bank robbery' as alleged in Count 1 of the indictment." (quoting indictment Count 2) (emphasis added).

Allen's charges would be amended further when the prosecutor, in opening statements, would allege "that the evidence is going to show" that "a black leather jacket", (allegedly Allen's), was found "[i]n between the place where the van was burned and where this man (indicating Allen) was seen talking to park employees", that "in the pocket", "three rounds of 12-gauge ammunition", "designed to work in the shotgun in the second getaway van", and that "three firearms" were "involved in this crime." (quoting opening statements) See Jones, 418 F.3d at 729 (Holding a "constructive amendment of the indictment can occur when [] the government (usually during its presentation of evidence and/or 'in its argument') . . . broadens the possible basis for conviction beyond those presented by the grand jury." (quoting Cusimano, 148 F.3d at 829)). (emphasis added). And with the government introducing the 12-gauge shotgun into their presentation in the opening statements, and then presenting the actual shotgun into evidence at Allen's trial. The government impermissibly broadened the indictment and the charges.

The government would continue with their amendment of the charges and indictment, when, in closing, the prosecutor would tell the jury, "[h]e (Allen) also has this in his coat: three winchester .12 gauge triple aught buckshot rounds, and you know what those go to. 'They go to this shotgun that was in the second getaway van.' It was under the seat and he had these extra rounds because he was going to be riding shotgun then an --'literally riding shotgun' and 'he was going to have this and he was going to have it full like it was with eight rounds, have some more extra rounds in case they need them." (Tr. Record Vol. 12 pg.43-44) And that Allen's "going to ride shotgun, he's going to stop anybody from stopping them from getting away with the money." (Tr. Record. Vol. 12 pg. 49).

15

It's impossible to infer, suggest, or for anyone, especially Allen to in any way anticipate that the government, from the indictment or the jury instructions, would adduse proof of not only the Russian SKS and the Chinese SKS. But that they would also introduce the unindicted and uncharged 12-gauge shotgun into evidence.

It too was impossible for Allen to anticipate that he would have to investigate charges surrounding the 12-gauge, or build a defense against the 12-gauge as the government would use it as evidence. Because it wasn't alleged nor charged in the indictment. Thus, making it impossible for Allen to be "informed of the nature and cause of the accusation[s]" against him, (quoting U.S. Const. amend. VI), so that Allen could know what he was going to "be held to answer for", (quoting U.S. Const. amend. V), and then prepare for what he "must be prepare to meet." Russell, 369 U.S. at 763.

In Leichtnam, the Seventh Circuit held that a charge was improperly amended where the government charged use and posession of a firearm, "to wit a Mossberg rifle", but at trial adduced proof of the Mossberg rifle along with two other weapons. The Court found that the government's proof impermissibly broadened the indictment and violated the defendants rights. 948 F.2d at 379-81. Similary, in Willoughby, the Seventh Circuit held that it was improper for the government to charge the defendant with using and carrying a firearm in relation to a drug trafficking crime, "to wit; the distribution of cocaine", and then prove at trial that he used and carried a weapon in connection with the offense of possession with intent to distribute. 27 F.3d at 266-67. Where both cases apply to Allen's contention that his indictment was impermissibly broadened with the allegations surrounding the 12-gauge shotgun, and its introduction into Allen's trial when it wasn't alleged nor charged in the indictment.

But moreover, the Court should look to the Supreme Court's decision in Stirone, where the Court held that "the right to have the grand jury 'make the charge on its own judgment is a  substantial right' which cannot be taken away with or without court amendment", and "because 'the court's admission of evidence and under its charge this 'might have been the bases upon which the jury convicted.' If so, 'he was convicted on a charge the grand jury never made against him.' This was "fatal error."" 361 U.S. at 218-19 (emphasis added) And "[d]eprivation of such a basic right 'is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." 361 U.S. at 217. Where Allen's court's admission of the 12-gauge was a bases for which the jury convicted Allen. Because the government would tell them that "three firearms" were "involved in this crime." (quoting opening statements).

Third, when the government specifically alleged and only charged that Allen "knowingly used and carried a firearm during and in relation to a crime of violence which may be prosecuted in a court of the United States, "'that is'", 'bank robbery' as alleged in Count 1." The government not only limited the amount of firearms they indicted Allen for, and limited the number of firearms they could actually introduce into evidence and charge Allen with. They limited the parameters for when, and/or in what manner they could allege to Allen's jury that the firearm was actually used and carried. Which could only be the Russian SKS, and/or the Chinese SKS, and the manner in which they could be alleged to have been "used and carried" could only be "in relation to" . . ., "'that is', 'bank robbery' as alleged in Count1."

The last minute introduction of the unindicted and uncharged third firearm; a 12-gauge shotgun; located later in a stolen van miles away; with no proof that either the van nor the shotgun were actually intended to be used in the bank robbery; and having no proof of whether the van nor the shotgun were actually going to be used at a later date, for an entirely different crime all together. Then coupled with the government's allegations and charges that "[h]e (Allen) also has this in his coat: three winchester .12 gauge triple aught buckshot rounds, and you know what those go to. "They go to this shotgun that was in the second getaway van.' It was under the seat and he had these extra rounds because he was going to be riding shotgun then an -- 'literally riding shot' and 'he was going to have this' and he was going to have it full like it was with eight rounds, have some more extra rounds in case they needed them", (Tr. Record. Vol. 12 pg.49), made doing so as to temporally distant from the charges in the indictment, United States v Ross, 412 F.3d 771 (7th Cir. 2005), and a constructive amendment to Allen's indictment.

The government failed to uphold the Sixth Amendment's demand that Allen must be "informed of the nature and cause of the accusation[s]" against him, (quoting U.S. Const. amend. VI), so that Allen could know what he was going to "be held to answer for", (quoting U.S. Const. amend. V), and then prepare for what he "must be prepared to meet." Russell, 369 U.S. at 763. Because it was improper to broaden the charges with a criminal plan broader than, but not fully included in Allen's actually, and then present proof; a 12-gauge shotgun, to support that additional and different criminal plan. When "a court cannot permit a defenadnt to be tried on charges that are not made in the indictment against him." Stirone, 361 U.S. at 217.

Lastly, both the government and the Eighth Circuit have and continue to concede that "it is clear that Allen's indictment suffers a Fifth Amendment defect", Allen, 406 F.3d at 943-44, that it "cannot be reasonably construed to charge a [single] statutory

aggravating factor, [or capital mens rea] 'as required for imposition of the death penalty', [and] it is 'constitutionally deficient to charge a capital offense.'" Allen, 357 F.3d at 747 (emphasis added). Because "[t]he prosecutor 'did not ask the grand jury to charge the statutory aggravating factor[s].'" Id. at 762. (emphasis added).

But after the indictment was returned, the government would file a Notice Of Intent To Seek The Death Penalty Against Allen, where they would allege and present for the first time, the unconstitutionally vague statutory aggravating factors; "Multiple Killings and Attempted Killings"; and "Grave Risk Of Death To Additional Persons", that were omitted from Allen's indictment.

Allen would make a timely objection to the Notice Of Intent To Seek The Death Penalty (E.D. Mo. Case# 4:97-cr-00141-ERW Doc# 172), and the fact that the information used in the Notice Of Intent To Seek The Death Penalty was going to be used to add additional and different charges. Because the statutory aggravating factors; "Multiple Killings and Attempted Killings"; and "Grave Risk Of Death To Additional Persons" were "opperat[ing] as the functional equivalent of the element of a greater offense", Ring, 536 U.S. at 609, and as such "Must appear in the indictment." Jones, 526 U.S. at 243 n6.

Instead of seeking a superseding indictment; constitutionally amending and adding the omitted statutory aggravating factors for imposition of capital case proceedings, charges, and a chance at a death sentence for Allen. Both the government and Eighth Circuit would allow Allen to proceed to trial with capital case proceedings, charges, and the possibility for a death sentence against Allen that wasn't authorized by Allen's indictment, nor authorized by the constitutional body of people with the respected jurisdiction to make such a decision; the grand jury.

But at Allen's trial, dispite Allen's indictment not "inform[ing]" Allen that the "nature and cause of the accusation[s]" against him (quoting U.S. Const. amend. VI), and what he would "be held to answer for", (quoting U.S. Const. amend. V), would in any way allege nor charge Allen with "Multiple Killings and Attempted Killings"; and "Grave Risk Of Death To Additional Persons." Nor that "the Government propose[d] to prove" those additional and different allegations and charges at Allen's trial. (quoting Notice Of Intent To Seek The Death Penalty). The government, using those unconstitutionally vague statutory aggravating factors, would first inform Allen and the jury in opening statements that "[t]he evidence is going to show that as [Mr. West] dove 'the shooter'", allegedly Allen, "'shot at Mr. West also', shooting both below his feet and over his head, barely missing him." (quoting opening statements pg.21-22) (emphasis added).

Then, further exploiting the unconstitutionally vague statutory aggravating factors; "Multiple Killings or Attempted Killings"; and "Grave Risk Of Death To Additional Persons", the government, in closing, would broaden the possible bases for conviction beyond that which was charged in the indictment, when alleging Allen was going to be "riding shotgun", in the second stolen van; which was never used in the crime, "then an--'literally riding shotgun' and'he (allegedly Allen) was going to have this' and he was going to have it full like it was with eight rounds", (Tr. Record Vol. 12 pg.43-44) (emphasis added), and "he's (allegedly Allen) going to stop anybody from stopping them from getting away with the money." (Tr. Record Vol. 12 pg.49). Which later would spawn into the government telling Allen's jury that "he (allegedly Allen) was 'literally going to be riding shotgun with this', [indicating shotgun] "ready to kill anyone" who tried to take their money from them or tried to stop them from getting away." (Tr. Record Vol. XIX, Case No. 4:97-cr-00141_ERW, Doc. #503, p.501 14-p. 511.11 (March 9, 1998)).

An indictment, even Allen's indictment "'must' contain [] the elements of the offense charged", Hamling v United States, 418 U.S. 87,117 (1974) (emphasis added), and then "provide enough factual particulars" to "sufficiently apprise the defendant of what he must be prepared to meet." Russell, 369 U.S at 763. Where the most basic of due process's customery protections is the demand of fair notice. See Conally, 269 U.S. at 391. Because criminal indictments at common law had to provide "precise and 'sufficient certainty'" about the allegations and charges involved. 4W Blackstone, Commentaries on the Laws of England, 301 (emphasis added).

It's impossible to take anything from Allen's indictment nor the Notice Of Intent To Seek The Death Penalty that suggests or infers that Allen should've done any sort of investigation, or mount a defense around the last-minute allegation and charges of the alleged "Multiple Killings or Attempted Killings"; and "Grave Risk Of Death To Additional Persons" against Mr. West.

Then, it was even more impossible to take anything from Allen's indictment, nor the Notice Of Intent To Seek The Death Penalty that would suggest or infer that Allen should've done an investigation, or mount a defense around the last-minute allegations and introduction of the 12-gauge, and the hypothetical and non-existing charges that Allen was "'literally going to be riding shotgun'", in the second stolen van; found later, miles away from the actual crime; with no proof that either the van nor the shotgun were actually intended to be used in the bank robbery; having no proof whether the van nor the shotgun were actually going to be used at a later date, for an entirely different crime all together, and that Allen was allegedly "ready to kill anyone who tried to take their money from them or tried

19

to stop them from getting away."

All of the above-mentioned facts and evidence make a clear showing that the government failed to uphold the Sixth Amendment's demand that Allen must be "informed of the nature and cause of the accusation[s]" against him, (quoting U.S. Const. amend. VI), so that Allen could know what he was going to "be held to answer for", (quoting U.S. Const. amend. V), and then prepare for what he "must be prepared to meet." Russell, 369 U.S. at 763. See Goldington v Bassingburn, Y.B. trin. 3 Edw. II, f. 27b (1310) (explaining that it was "the law of the land" that "no one [could] be taken by surprise" by having to "answer in court for what [one] has not been warned to answer.").

All of the above-mentioned facts and evidence also show that what "[t]he Government propose[d] to prove", (quoting Notice Of Intent To Seek The Death Penalty), and did prove at trial, constructively amend Allen's indictment by broadening the possible bases for conviction to include an earlier and later than operative timeline, for a criminal plan broader than, but not fully set forth in Allen's indictment. Where the government would use legally relevant and legally essential, additional and different allegations, purported facts, elements, evidence, and charges, to convict Allen on charges the grand jury never made against him. See Stirone, (Holding that "[t]he right to have the grand jury 'make the charge on its own judgment' is a substantial right which cannot be taken away with or without court amendment" and . . . "because the court's admission of evidence and under its charge this 'might have been the basis upon which the trial jury convicted.' If so, he was convicted on a charge the grand jury never made against him. This was "fatal error."" 361 U.S at 218-19 (emphasis added). And "[d]eprivation of such a basic right 'is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." 361 U.S. at 217. Thus, making Allen's custody, confinement, and the continued execution of Allen's sentence unconstitutional, "in violation of the Constitution or laws of . . . the United States", Samirah, 335 F.3d at 549, and Allen requires an immediate and/or speedier release. Or, "a new trial" should be granted "as a matter of right." Weaver, 137 S.Ct. at 1914.

## NEITHER THE GOVERNMENT NOR THE EIGHTH CIRCUIT CAN AUTHORIZE WHAT THE INDICTMENT NOR THE GRAND JURY WASN'T ASKED TO AUTHORIZE

The Fifth Amendment doesn't ask, nor suggests, but instead demands upon both the prosecutors and courts that "[n]o person", including Allen, "shall be held to answer for a capital [] crime, unless on a presentment or an indictment of a Grand Jury." (quoting U.S. Const. amend. V.) And, in no way does such a demand allow for the slightest discretion

or assumption to be made by either the prosecutor nor the court to take on the constitutional role of the grand jury and state that "'if the grand jury had been asked to charge' the grave-risk-of-death-[to additional others] statutory aggravating factor'", for imposition of capital case proceedings, charges, and a possible capital punishment for Allen, that they are 100% sure that the grand jury "would have done so." Allen, 406 F.3d at 948 (emphasis added). See ex parte Bain, 121 U.S. 1,10 (1887) (Where over 100 years ago the Court would warn that "[i]f it lies within the province of a court to change the charging part of an indictment 'to suit its own notions of what it ought to have been', or 'what the grand jury would have "probably" have made it if their attention had been called to suggested charges', the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the Constitution says 'no person shall be held to answer', may be frittered away until its value is almost destroyed.") (emphasis added). see also Vasquez, 474 U.S. at 263 (Only "the grand jury [decides to] charge a greater offense or a lesser offense; numerous counts or a single count; 'and perhaps most significiant of all, a capital offense or a noncapital offense -- all on the basis of the same facts.'") (emphasis added).

"'Unless' on presentment or indictment of a grand jury", "[n]o person", including Allen, "shall be held to answer for" what's not presented, alleged, or charged in the indictment. But more importantly, "[n]o person shall be held to answer for a capital [] crime, unless on presentment or an indictment of a grand jury." (quoting U.S. Const. amend. V). Thus, making Allen's custody, confinement, and the continued execution of Allen's sentence unconstitutional, "in violation of the Constitution or laws of . . . the United States", Samirah, and requires an immediate or a speedier release. Or, "a new trial" should be granted "as a matter of right." Weaver, 137 S.Ct. at 1914.

## A NOTICE CANNOT REPLACE AN INDICTMENT
## OF A GRAND JURY IN A FEDERAL CASE

If this was a State case and the prosecutor sought to enhance Allen's non-capital case allegations, purported facts, elements, evidence, and charges to be those of a capital nature, and the State bypassed the grand jury and then only submitted the statutory aggravating factors and capital mens rea in a Notice Of Intent To Seek The Death Penalty. (Which would essentionally make the Notice Of Intent To Seek The Death Penalty the functional eqivalent of the State's "Bill Of Particulars"). Then it would not only be Constitutional, but even sufficient to proceed forward with allegations, purported facts, elements, evidence, and even charges that were all capital in nature and effect. Because the Supreme Court, every other court, including this Court, have all held "that 'no federal right to a grand jury' exists 'in State prosecutions'", and "it 'does not require the States to observe the Fifth

21

Amendment provisions for presentment or indictment by a grand jury.'" <u>Alexander v Louisiana</u>, 405 U.S. 625,633 (1972).

Yet, this is a Federal Death Penalty case and the government sought to seek a Federal Death sentence against Allen. Which, as a result, would also include allegations, purported facts, elements, evidence, and charges, when the Fifth Amendment demands that "[n]o person", including Allen, "shall be held to answer for a capital [] crime, "unless" on a presentment or indictment of a Grand Jury." And for the Eighth Circuit and the government to reject the Constitution for their own logic and/or assumptions, to apply to a Federal Death penalty case what can only be done in the State. Thus, making Allen's custody, confinement, conviction, and the continued execution of Allen's sentence is unconstitutional, "in violation of the Constitution or laws. . . of the United States", <u>Samirah</u>, and requires an immediate and/or speedier release. Or, "a new trial" should be granted "as a matter of right." <u>Weaver</u>, 137 S.Ct. at 1914.

### <u>"EXCEPTIONAL CIRCUMSTANCES"</u>

Allen submits that what makes his circumstances "extraordinary" is that he is innocent, and presents to this Court the facts and evidence to substantiate his innocence claim.

When Allen's non-capital case was allowed to proceed forward with capital case proceedings, charges, and the possibility of a death sentence for Allen. Counsel for Allen would inform Allen of counsel's plan to override Allen's objective and instructions for counsel to maintain and prove Allen's innocence, and that counsel was going to concede Allen's guilt as a sacrifice for a possible life sentence. Where the Supreme Court has recently held that the "defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." <u>McCoy v Louisiana</u>, 138 S. Ct. 1500 (2018) (citation omitted).

Allen would file multiple motions to the court; seeking the court's help to substitute counsel from his case, (8) months before trial. (E.D. Mo. case# 4:97-cr-00141-ERW-2 Doc.#95 & 97). But upon receiving each of Allen's motions, the court would "immediately" deny Allen's motion(s) without a hearing, an inquiry, nor an investigation into the merits of the motion, whether counsel should've been removed before trial at Allen's request, or whether leaving counsel on Allen's case would and/or could violate Allen's Sixth Amendment right to "the Assistance of Counsel." see <u>Martel v Clair</u>, 565 U.S. 648 (2012) ("As 'all circuit's agree', court's cannot properly resolve substitution motions, without probing why a defendant wants a new lawyer.'") (citation omitted) (emphasis added). see also <u>McCoy</u>, 138 S.Ct. at ___. ("[I]f counsel is appointed, and unreasonably insists on admitting guilt over the defendant's objection, a capable trial judge will 'almost certainly grant a timely

request to appoint substitute counsel. And if such a request is denied, the ruling may be vulnerable on appeal.'") (citation omitted) (Alito, J., with Thomas, J., and Gorsuch, J., dissenting).

With the court denying Allen's motions to substitute counsel, counsel would then use the denial as a justification and/or an approval by the court to override Allen's objective for counsel to maintain and prove Allen's innocence, and then counsel would concede Allen's guilt to the jury. And with counsel's help, the jury would find Allen guilty.

But then, counsel would file a motion to the court, conceding that "[t]he District Court erred, clearly erred, or abused its discretion in denying [Allen's] motion[s] for appointment of different counsel. " (filed by trial counsel to the trial court on on May 18, 1998). But like Allen's motions, the court would "immediately" deny counsel's motion without a hearing, an inquiry, nor the slightest investigation by the court to see why counsel would file such a motion, why counsel's motion essentionally conceded that Allen's motions to substitute counsel had merit and should have been granted, and/or whether or not the court had actually erred by leaving counsel on Allen's case and violated Allen's Sixth Amedment right to the "Assistance of Counsel."

What makes Allen's circumstances both "extraordinay", and even "exceptional", is that when counsel made the decision to override Allen's objective and instructions for counsel to maintain and prove Allen's innocence at trial, and counsel would instead concede Allen's guilt to the jury. Counsel didn't look for, discover, nor present in Allen's defense;

1) The Government's Negative DNA Results; that exonerate Allen and proves that neither his DNA, nor the victim's DNA was the source of the DNA found at the crime scene, on evidence linked to the crime and those involved in the crime itself. (APPENDIX G ).

2) The Government's Negative Gasoline Results; that exonerate Allen and prove that none of Allen's clothes would come back with a single trace of gasoline from inside the "gasoline-soaked" van that was used in the crime. And where suspect Holder's clothing would "all" come back positive. (APPENDIX H ).

3) Report; where the police and the FBI would discover another possible source of DNA, found on a "DAMP RAG", in an area where only the second suspect had access to. (Sent to the crime lab from DNA testing, and the results have yet to turned over to the defense after 23 years). (APPENDIX I ).

4) Report; where a witness would call the FBI and inform them that he saw suspect Holder and someone other than Allen, a few days before the robbery, talking about robbing the bank. (APPENDIX J ).

23

5) <u>Dispatchtape Transcript</u>; where several witnesses would report to the FBI and local police that they saw someone other than Allen fleeing the crime scene, with an injury to his right hand. (These witnesses reports were never turned over to the defense and neither was their identity). (APPENDIX K ).

6) <u>Transcript: Interview</u>(partial); where the FBI would interview a security guard, who was at a shopping mall; Northwest Plaza, picking up his paycheck, who tell the agents that he saw Allen at the shopping mall, with bags from purchases, and that it was at the exact time the crime took place. (APPENDIX L ).

### NEWLY DISCOVERED EVIDENCE

7) <u>Correspondance Between Allen and Counsel</u>; where the communication between Allen and counsel shows that counsel was ineffective and that counsel made no effort to investigate Allen's case, nor any of the above-mentioned facts and evidence after counsel decided that he was going to concede Allen's guilt. (APPENDIX M ).

8) <u>The Arrest Of Officer Thomas Carroll and the Investigation Into Officer Joseph Nickerson</u>; where upon Allen's arrest, Allen would tell both officers Thomas Carroll and Nickerson that he was at Northwest Plaza shopping mall at the time the crime took place. Yet, both officers would claim that they went to the mall, and not one witness would substantiate Allen's claim of being at the the mall. (But neither officer would ask to see any surveillance footage from the mall that day?)

    a) Thomas Carroll has since been arrested for beating a suspect in his custody. (APPENDIX N ).

    b) Joseph Nickerson is currently under investigation for his role in a wrongful conviction, where he would lie under oath, and hide surveillance video. (APPENDIX O ).

See <u>Porter v McCollum</u>, 558 U.S. 30, 40 (2009) (Court holding that when counsel "ignored pertinent avenues for investigation 'of which he should have been aware'", that counsel's "decision not to investigate did not reflect reasonable professional judgment.") see <u>In re Davis</u>, 557 U.S. 952,953 (2009) (Holding that "the 'substantial risk' of putting an 'innocent man' to death is 'sufficiently exceptional.'") (emphasis added). see also <u>McQuiggins v Perkins</u>, 569 U.S. 383,392 (2013) (Holding that to prevent a "fundamental miscarriage of justice", an untimely petition is not barred when the petitioner makes a "credible showing of actual innocence," which provides a gateway to federal review of the petitioner's otherwise procedurally barred claim of a constitutional violation.

One error and/or defect; the government's omission of the statutory aggravating factors and capital mens rea from Allen's indictment would not only have a ripple effect that "affect[ed] the framewrok within which " Allen's "trial proceed[ed]." <u>Fulminante</u>,

499 U.S. at 309-10. But it would also evolve into a plague of violations to follow, which would infect Allen's Fifth Amendment right that "[n]o person[, including Allen, "shall be held to answer for a capital []crime, unless on a presentment or indictment of a grand jury " , Allen's Sixth Amendment right that all defendant, including Allen, must be "informed of the nature and cause of the allegation[s]" against him; Allen's right to the "Assistance of Counsel", and Allen's Fourteenth Amendment "right to due process." Where as a result, a miscarriage of justice has made Allen another one of its victims. Because that error and/or defect would deny Allen a fair trial, and then deprive Allen's jury the opportunity to know about Negative DNA results; Negative gasoline results; witnesses who saw someone other than Allen fleeing the crime scene with an injury to his right hand; a witness who would tell the FBI that he saw someone other than Allen with suspect Holder talking about the crime a few days before the robbery; another source of possible DNA; police officer's lies; and even an alibi that would've exonerated Allen at trial.

Allen's proceedings, charges, and the continued execution of Allen's unconstitu-tional sentence were all obtained and/or conducted "in violation of the Constitution or laws [] of the United States." Samirah, 335 F.3d at 549. And Allen is currently one of only few men who is currently on Federal Death Row, which is _ strictly prohibited by the Fifth Amendment's demand onto prosecutors and court's that "[n]o person", especially Allen, "shall be held to answer for a capital [] crime, unless on a presentment or indictment of a Grand Jury." (quoting U.S. amend. V) Thus, making Allen's custody, confinement, charges, an dthe continued execution of Allen's sentences prohibited, unconstitutional, "in violation of the Constitution or laws [] of the United States", Id. 549, and requiring Allen's immedi-ate and/or speedier release. Or, "a new trial" should be granted "as a matter of right." Weaver, 137 S.Ct. at 1914.Because Allen would make a timely objection before trial and the issue would be raised in Allen's dirct appeal. see Weaver, ("Thus, in the case of a struct-ural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error's actual effect on the outcome." (quoting Neder v. United States, 527 U.S. 1,7 (1999). And when "a structural error is preserved on direct appeal', the balance is in the defendant's favor, and "a new trial generally will be granted 'as a matter of right.'")

## STATEMENT OF JURISDICTION

The Constitutional right at the heart of this motion is so central to the judicial machinary, and ensuring that it operates with fundamental fairness, that it doesn't ask, but instead demands upon both prosecutors and courts that "[n]o person," including Allen, shall be held to answer for a capital [] crime, "unless" on a presentment or an indictment of a Grand Jury." (quoting U.S. Const. amend. V) (emphasis added). Without which, would

make all proceedings, charges, and any punishment that followed, unconstitutional, fundamentally unfair, prohibited, and a structural error and/or defect that would "affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself." Fulminante, 499 U.S. at 310.

Under the Fifth Amendment, "unless on a presentment or an indictment of a Grand Jury", then "[n]o person", including Allen, "shall be held to answer for" anything; charges; proceedings; punishment; especially a "capital [] crime", that would follow the complete disregard to such a demand. But both the government and the Eighth Circuit would step outside their respected jurisdictions, ignore the Fifth Amendment's demand upon them, take on the role of the grand jury, and then speculate, while stating with 100% certainty that "'if the grand jury had been asked'", which they weren't, "to charge the grave-risk-of-death-to-others statutory aggravating factor", that it's their opinion Allen's grand jury "would have done so." Allen, 406 F.3d at 948 (emphasis added).

Yet, the grand jury, even Allen's grand jury "presupposes an investigative body 'acting independently of either prosecuting attorney or judge,'" Dionisio, 410 U.S. at 16-17, prohibiting both prosecutors and courts from "looking into and revising the judgment of the grand jury upon the evidence", Costello, 350 U.S. at 362-363, and only giving the grand jury the power, authorization, and the Constitutional authority to "charge a greater offense or a lesser offense; numerous counts or a single count; 'and perhaps most significant of all, a capital offense or a noncapital offense'-- all on the basis of the same facts." Vasquez, 474 U.S. at 263 (emphasis added).

First, Allen invokes this Court's jurisdiction, where it's this court's "duty" and "right" to not only "correct an error", but to also "confront the question" on an incorrect judicial decision that's in clear conflict with the Constitution's demand and prohibits. Especially when it's been sent to this Court to carry out its misdeed. Where in Gamble v United States, 204 LED 2d 322,348 (2019), the Court held that "[i]f . . . any solemnly adjudged case can be shown to be founded in error, 'it is no doubt "'the right'" and "'the duty'" of the judges who have a similar case before them, to correct the error.'" (Thomas J., concurring) (quoting 1J. Kent, Commentaries on American Law, 439 (1826)) (emphasis added). Because there have and will continue to be times when "judicial decisions may incorrectly interpret the law, and when they do, 'subsequent courts "must" 'confrom the question when to depart from them.'") (emphasis added).

The fact that the Constitution "outranks other sources of law is inherent in its nature." Id. at 349-350. See A. Amar. America's Constitution, 5 (2005) (explaining that the Constitution is a constitutive document); Kesavan, The Three Tiers of Federal Law, 100

NW. U. L. Rev. 1479, 1499, n.99 (2006) (arguing that "[i]t is unnessary for the Constitution to specify that 'it is superior to other law' because it is higher law made by We the People - and the only such law.") And "because the Constitution is supreme over other sources of law, it requires [courts] to privelege its text over [courts] precedents 'when the two are in conflict.'" id, at 350.

The Eighth Circuit's holding in Allen's case clearly pits itself against what the Constitution demands and what the Constitution prohibits. Where the Fifth Amendment demands that "unless on a presentment or an indictment of a Grand Jury", then prohibits that "[n]o person", including Allen, "shall be held to answer for" anything that would follow. But the Eighth Circuit would boldly substitute the Constitution's demands and what the Constitution prohibits for its discretion of what it thinks Allen's grand jury "would have done", "if the grand jury had been asked." Allen, 406 F.3d at 948. Where there's "no legitimate reason why a court may privilege a demomonstrably erroneous interpretation of the Constitution over the Constitution itself." Id, at 350. see also Osborn v Bank of United States, 9 weat. 738,866 (1824)("Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect to the will of the . . . law.") (Marshall, C.J.,); The Federalist, No. 78 at 468-69 (C. Rossiter ed. 1961) (Holding that courts thus may not "substitute [its] own pleasure to the constitutional intentions of the legislature); see also 1W. Blackstone Commentaries on the Laws of England, 69-70 (reasoning that a judge must issue judgments "according to the known laws and customs of the land" and not "according to his 'private sentiments'" or "own 'private judgment.'") (emphasis added).

The decision by the Eighth Circuit is clearly contrary to and in cnflict with the Constitution, disregards the Constitution's supremacy over its own private judgment, and was tantamount to making new law.Where a "decision is manifestly absurd or 'unjust'" is not simply "bad law", but "no law" at all. Blackstone, 70 (emphasis added). And "[w]herever the Constitution comands, discretion terminates" because continued adherence to "palpable error" is a "violation of 'duty', an usurpation." Maeshall v Baltimore & Ohio R. Co., 16 How. 314,343-344 (1854) (Daniel, J., dissenting).

the Eighth Circuit's holding in Allen's case has also invoked this Court's jurisdiction; calling onto it to carry out its "duty" and exercise its "right" to "correct the error", Id. 348, where the Eighth Circuit has chosen to ignore and bypass the restrictions of the Constitution, but demands this Court, which has the jurisdiction over Allen's custody, confinement, and the continued execution of Allen's sentence, to not only continue to carry out what the Constitution has prohibited, but to uphold what is unconstitutional. Because

27

"[n]o person", including Allen, "shall be held to answer for a capital [] crime, "unless" on a presentment or an indictment of a Grand Jury." (quoting U.S. Const. amend. V) (emphasis added).

Second, Allen invokes this Court's jurisdiction pursuant 28 U.S.C. 2241's Savings Clause. Where under the Savings Clause, a prisoner can seek a writ of habeas corpus through an action under 2241 if the prisoner can show "that the remedy by [2255] motion is inadequate or ineffective to test the legality of his detention." 28 U.S.C. 2255(e).

Section 2255 is inadequate or ineffective as applied to a specific case only where there is "some kind of structural problem with section 2255." Webster v Daniels, 784 F.3d 1123, 1136 (7th Cir. 2015) (en banc). A structural problem requires "something more than a lack of success with a section 2255 motion." Id. It must "foreclose[] even one round of effective collateral review, unrelated to the petitioner's own mistakes." Poe v LaRiva, 834 F.3d 770,773 (7th Cir. 2016) (citation and quotation omitted). Section 2255 is inadequate or ineffective where the court finds that the defendant did not have a "reasonable opportunity [in a prior 2255 proceeding] to obtain a reliable judicial determination of the fundamental legality of his conviction and sentence." Chazen v Marske, 938 F.3d 851, 856 (7th Cir. 2019) (alteration in original) (quoting In re Davenport, 147 F.3d 605,609 (7th Cir. 1998)).

The structural problem with 2255 in Allen's case is that 2255(h) did not and does not permit Allen to file the claim set forth in this motion, and/or a second or successive 2255 motion. Because "issues that were 'raised and decided on direct appeal[7]' "cannot be relitigated" in a 2255 motion." Allen v United States, U.S. Dist. LEXIS 4985 (8th Cir. May 10, 2011) (citation omitted) (quoting United States v Wiley, 245 F.3d 750,752 (8th Cir. 2001)).

Neither could Allen have received authorization to file a second or other successive motion under 2255(h) because the basis on which Allen sought relief wasn't newly discovered evidence nor a new rule of constitutional law. Allen's claim rests on the Constitution's demand upon both prosecutors and the courts that "[n]o person", including Allen, "shall be held to answer for a capital [] crime, "unless" on a presentment or an indictment of a Grand Jury," (quoting U.S. Const. amend. V) (emphasis added), and precedent Supreme Court case law that came before Allen that shows why his proceedings, charges, and punishment are prohibited; ex parte Bain, Stirone v United States, Russell v United States, Vasquez v Hillery, and Arizona v Fulminante. And because the Eighth Circuit, on direct review,

---

7 Allen would raise this claim on direct appeal. Thus, barring him from raising it on 2255.

substituted its opinion on what it thought the grand jury "would have done". . . "if the grand jury had been asked", over the Constitution's demand and Supreme Court precedent. Thus, putting its discretion over the Constitution and the law, and essentially "forecloed even one round of effective collateral review, unrelated to [Allen's] own mistakes," Id, where Allen could obtain a reliable judicial determination of the fundamental legality of his conviction and sentence.

Recently, in Webster v Daniels, 784 F.3d 1123 (7th Cir. 2015) (en banc), for the first time, the Seventh Circuit held that the Savings Clause was met for a constitutional claim. Where Webster sought to challenge his death sentence as barred by Atkins v Virginia, 536 U.S. 304 (2002), which held that the Eighth Amendment forbids the execution of a person with an intellectual disability. Although Webster had raised an "Atkins claim" in his 2255 proceeding, he wished to present "newly discovered evidence" to support that claim in his 2241 petition. Webster, 784 F.3d at 1125. And the Seventh Circuit found that "there's no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty." Id, at 1139.

In Webster, the court "took great care to assure that its holding was narrow in scope", Poe, 834 F.3d at 774, and would "have a limited effect on future habeas corpus proceedings." Webster, 784 F.3d at 1140 n.9. But the court would leave open a narrow window, where his claim falls within that "narrow [] scope", when Allen asks this Court to consider whether "there is a categorical bar against resort to section 2241 in cases where . . . the Constitution [and precedent case law] categorically prohibits a certain penalty," Id, at 1139, that makes Allen "categorically ineligible for the death penalty." Webster, 784 F.3d at 1138-40.

Allen first turns this Court's attention to the fact that the death penalty is said to be "categorically reserved" for "the worst of the worst." Where there's a process that the Department of Justice goes through in determining whether a defendant and their crime falls within the rare category of being death eligible. There are countless factors that will prohibit and/or exclude many defendants from falling into the death eligible category, and other factors will make a certain category of defendant's eligible for the death penalty.

Next, Allen turns to the Fifth Amendment, which demands upon both prosecutor's and courts that"'[n]o person shall be held to answer for a capital [] crime', "unless" on a presentment or an indictment of a Grand Jury." (quoting U.S. Const. amend. V). This right in itself makes a certain category of defendants eligible for the death penalty, and then makes other defendants "categorically ineligible for the death penalty." Webster, 784 F.3d

at 1138-40. because "'unless', on a presentment or an indictment of a Grand Jury", then "'[n]o person'", including Allen, "shall be held to answer for a capital [] crime". And the "capital [] crime" for Allen would literally be the death penalty by lethal injection, and would then violate Allen's Eighth Amendment right not be be subjected to "cruel and unusual punishment", when Allen's grand jury did not authorize proceedings, charges, nor a punishment of a capital nature, and therefore the Constitution forbids such a penalty.

Not only does the law, but the Constitution of the United States prohibit Allen from being eligable for the death penalty, and therefore forbids such a sentence to be carried out. Because as both the government and the Eighth Circuit concede, "[I]t is clear that Allen's indictment suffers a Fifth Amendment defect", Allen, 406 F.3d at 943-44, that the indictment "cannot be reasonably construed to charge a [single] statutory aggravating factor, [or capital mens rea] 'as required for imposition of the death penalty', [and] [the indictment] is 'constitutionally deficient to charge a capital offense.'" Allen, 357 F.3d at 747. (emphasis added).

This Court exercising its jurisdiction is warranted, and further briefing, and/or arguments should be allowed to properly settle this claim.

Respectfully submitted,


Billie Allen
26901-044
P.O. Box 33
Terre Haute, IN.
47808

# APPENDIX A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　) No. 4:97CRO141 ERW
　　　　　　　　　　　　　　　　　　)　　　　　　(TCM)
NORRIS G. HOLDER and　　　　　　　 )
BILLIE JEROME ALLEN,　　　　　　　 )
　　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　　)

## INDICTMENT

## COUNT I

The Grand Jury charges that:

On or about March 17, 1997, in the City of St. Louis within the Eastern District of

Missouri,

NORRIS G. HOLDER
and
BILLIE JEROME ALLEN,

the Defendants herein, by force, violence, and intimidation did take from the person or presence

of another, a quantity of United States currency, belonging to, and in the care, custody, control,

management, and possession of the Lindell Bank & Trust Company, the deposits of which were

then insured by the Federal Deposit Insurance Corporation; and in committing such offense did

kill Richard Heflin.

In violation of 18 U.S.C. §§ 2, 2113(a) and (e).

OPTIONAL FORM 99 (7-90)

FAX TRANSMITTAL   # of pages ▶ 2

To: Rick Sindel
Dept./Agency

From: Jackie / Judy Mummert
Phone # 539-7210

Fax # 721-8545
Fax # 539-3514

NSN 7540-01-317-7368   5000-101   GENERAL SERVICES ADMINISTRATION

04/17/97   16:47   ☎314 539 3514        USDC-ST LOUIS MO                              ☑002

## COUNT II

The Grand Jury further charges that:

On or about March 17, 1997, in the City of St. Louis within the Eastern District of

Missouri,

NORRIS G. HOLDER
and
BILLIE JEROME ALLEN,

the Defendants herein, knowingly used and carried a firearm during and in relation to a crime of

violence which may be prosecuted in a court of the United States, that is, bank robbery as alleged

in Count I of this indictment and incorporated herein; and that in so doing

NORRIS G. HOLDER
and
BILLIE JEROME ALLEN,

the Defendants herein, committed murder as defined in 18 U.S.C. § 1111, that is, the unlawful

killing of Richard Heflin with malice of forethought, such murder being willful, deliberate,

malicious, premeditated, and committed in the perpetration of a robbery.

In violation of 18 U.S.C. §§ 2, 924(c)(1) and (j)(1).

A TRUE BILL.

_____

FOREPERSON

EDWARD L. DOWD, JR.
United States Attorney


_____

JOSEPH M. LANDOLT (#6484)
Assistant United States Attorney

# APPENDIX B

RECEIVED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**    8    8
**EASTERN DIVISION**

U.S.
EAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    No.  4:97CR141 ERW (TCM) |
| | ) |
| NORRIS G. HOLDER and | ) |
| BILLIE JEROME ALLEN, | ) |
| | ) |
| Defendants. | ) |

**GOVERNMENT'S NOTICE OF INTENT TO SEEK THE**
**DEATH PENALTY AGAINST DEFENDANT ALLEN**

COMES NOW the United States of America, by and through its attorneys, Edward L. Dowd, Jr., United States Attorney for the Eastern District of Missouri, and Joseph M. Landolt, Assistant United States Attorney for said District, and pursuant to 18 U.S.C. § 3593(a) notifies the Court and Defendant Allen that the Government believes that the circumstances of the offenses charged in the indictment are such that, in the event of a conviction, a sentence of death is justified under Chapter 228 (Sections 3591-3598) of Title 18 of the United States Code, and that the Government will seek the sentence of death for the offenses of:  Count I, bank robbery resulting in the death of Richard Heflin, in violation of 18 U.S.C. §§ 2, 2113(a) and (e), which carries a possible sentence of death, and;  Count II, use of a firearm during and in relation to a federal crime of violence resulting in the murder of Richard Heflin, in violation of 18 U.S.C. §§ 2, 924(c)(1) and (j)(1), which carries a possible sentence of death.

The Government proposes to prove the following factors as justifying a sentence of death:

A. Statutory Proportionality Factors Enumerated Under 18 U.S.C. § 3591(a)(2)(A) through (D)

1. **Intentional Killing.** The Defendant intentionally killed Richard Heflin. Section 3591(a)(2)(A).

2. **Intentional Infliction of Serious Bodily Injury.** The Defendant intentionally inflicted serious bodily injury that resulted in the death of Richard Heflin. Section 3591(a)(2)(B).

3. **Intentional Act To Take A Life Or Use Lethal Force.** The Defendant intentionally participated in an act, contemplating the life of a person would be taken or intending that lethal force would be used in connection with the person, other than one of the participants in the offense, and Richard Heflin died as a direct result of the act. Section 3591(a)(2)(C).

4. **Intentional Act of Violence Which Created a Grave Risk of Death.** The Defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Richard Heflin died as a direct result of the act. Section 3591(a)(2)(D).

B. <u>Statutory Aggravating Factors Enumerated Under 18 U.S.C. § 3592(c)</u>

1. **Grave Risk of Death to Additional Persons.** The Defendant, in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense. Section 3592(c)(5).

2. **Heinous, Cruel, or Depraved Manner of Committing Offense.** The Defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Richard Heflin. Section 3592(c)(6).

3. **Commission of the Offense for Pecuniary Gain.** The Defendant committed the

2

3. **Commission of the Offense for Pecuniary Gain.** The Defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value. Section 3592(c)(8).

4. **Substantial Planning and Premeditation.** The Defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism. Section 3592(c)(9).

5. **Multiple Killings or Attempted Killings.** The Defendant intentionally killed or attempted to kill more than one person in a single criminal episode. Section 3592(c)(16).

C. Other, Non-Statutory, Aggravating Factors Identified Under 18 U.S.C. § 3593(a)(2)

1. **Vileness of the Crime.** The Defendant's conduct in committing the offenses was substantially greater in degree than that described in the definition of the crimes, apart from the statutory aggravating factors. Smith v. Commonwealth, 248 S.E.2d 135 (1978), cert. denied, 441 U.S. 961 (1979).[1]

2. **Future Dangerousness of the Defendant.** The Defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society. Simmons v. South Carolina, 114 S. Ct. 2187, 2193 (1994).

a) Specific Threats of Violence. The Defendant has threatened to commit other acts of violence, in addition to the capital offenses committed in this case and the statutory factors alleged in this Notice. The Government will provide Defendant with specific information regarding these threats of violence.

---

[1] This factor will only be submitted to the jury in the alternative to the statutory aggravating factor set forth in paragraph B(2), "heinous, cruel, or depraved manner of committing the offense," pursuant to 18 U.S.C. § 3592(c)(6), or in the event that the § 3592(c)(6) statutory aggravating factor is not submitted to the jury.

3

b) Low Rehabilitative Potential. Efforts to rehabilitate and/or deter the Defendant from criminal conduct have failed, as evidenced by, among other things, the fact that Defendant was being supervised by the Missouri Board of Probation and Parole for a previous offense at the time of Defendant's commission of the capital offenses in this case.

c) Lack of Remorse. The Defendant has demonstrated a lack of remorse for the capital offenses committed in this case, by statements and/or actions.

3. **Other Criminal Activity.** The Defendant has committed, attempted to commit, and/or threatened to commit other criminal acts, in addition to the capital offenses committed in this case and the statutory factors alleged in this Notice, including but not limited to one or more of the following:

a) The Defendant committed the felony of tampering in the first degree on or about the 10th day of April 1995, in the City of St. Louis, as set out more fully in St. Louis Metropolitan Police Department Complaint No. 95-050849 and the records of the Circuit Court for the City of St. Louis, Missouri, in the matter of State of Missouri v. Billie J. Allen, Cause No. 951-0001280.

b) The Defendant committed the felony crime of tampering in the first degree on or about October 2, 1995, as more fully described in St. Louis Metropolitan Police Department Complaint No. 95-14694.

4. **Victim Impact Evidence.** Richard Heflin's personal characteristics as an individual human being and/or the impact of the death of Richard Heflin upon his family. Payne v. Tennessee, 111 S. Ct. 2597, 2608-09 (1991).

a) Characteristics. Mr. Heflin's personal characteristics as an individual human being include but are not limited to one or more of the following:

4

        i)   Mr. Heflin was a decorated veteran of the Vietnam War.

        ii)  Mr. Heflin was former member of the Caseyville, Illinois Police Department.

        iii) Mr. Heflin was a loyal and valued employee of Lindell Bank & Trust Company.

        iv) Mr. Heflin had a lively sense of humor, was a well-liked friend and coworker and was a valuable member of society.

        b)  Impact of Death. Mr. Heflin's family has suffered injury and loss, as a result of his death, including but not limited to one or more of the following:

        i)   Mr. Heflin was the loving and caring father of three children: Jason Heflin, 22 years of age; Richard Heflin, III, 17 years of age; and Justin Heflin, 14 years of age. Each of Mr. Heflin's children miss his love, affection, guidance, companionship, and support.

        ii)  Mr. Heflin was the loving and caring husband of Dana Heflin whom he married in 1996. Dana Heflin misses his love, affection, companionship, and support.

        iii) Richard Heflin provided financial support for his former wife, Susan Heflin, who is now without that support.

        iv) Richard Heflin was the loving and caring son of Mr. and Mrs. Richard Heflin, Sr. Mr. Heflin's parents miss his love, affection, and companionship.

        v)  Mr. Heflin was the loving and caring brother of Gina Heflin, Sherry Holmes,

Donna Hawks, Michael Heflin, and Glen Heflin. Mr. Heflin's siblings miss his love, affection, and

companionship.

Respectfully submitted,

EDWARD L. DOWD, JR.
United States Attorney

JOSEPH M. LANDOLT (#6484)
Assistant United States Attorney

$\underline{8/8/97}$
Date

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the above and foregoing was mailed this

_____ day of August 1997, postage prepaid United States Mail first class to:

Richard Sindel
Attorney for Defendant Allen
8008 Carondelet, Suite 301
Clayton, Missouri   63105

and

Charles M. Shaw
Attorney for Defendant Holder
222 S. Meramec
Clayton, Missouri   63105

ASSISTANT UNITED STATES ATTORNEY

6

# APPENDIX C

## I. THE FDPA

The FDPA sets forth the procedure for all capital cases. 18 U.S.C. § 3591(a)(2). Under the FDPA, the Government must notify a defendant "a reasonable time before trial or before acceptance by the court of a plea of guilty" that it intends to seek the death penalty against that defendant. 18 U.S.C. § 3593(a)(1). The statute further provides that a jury, in determining whether a defendant should receive a sentence of death, {2003 U.S. Dist. LEXIS 6} must decide at a "separate sentencing hearing" whether the defendant is eligible for the death penalty and, if so, whether the defendant should actually receive the death penalty. 18 U.S.C. § 3593(b).

For a defendant to be eligible for the death penalty in a homicide case, the government must prove beyond a reasonable doubt that the defendant had the requisite mental culpability of 18 U.S.C. § 3591(a)(2), and that a least one of the sixteen statutory aggravating factors of 18 U.S.C. § 3592(c) was present. If the jury determines that the Government has met its burden as to both "eligibility" requirements, the jury proceeds to its "selection" decision, where it must consider whether all of the existing aggravating factors, both statutory and nonstatutory, § 3592(c), outweigh all mitigating factors, § 3592(a), such that a sentence of death is justified, § 3593(e). The Government must prove all aggravating factors beyond a reasonable doubt, while a defendant must only establish the existence of mitigating factors by a preponderance of the evidence. § 3593(c). For a death sentence to be imposed, the jury must be{2003 U.S. Dist. LEXIS 7} unanimous. § 3593(e).

## II. THE NECESSITY OF INCLUSION

The Supreme Court held, in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. "In federal prosecutions, such facts must also be charged in the indictment." *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 1783, 152 L. Ed. 2d 860 (2002) (citing *Apprendi*, 530 U.S. at 476); *see also Jones v. United States*, 526 U.S. 227, 243 n.6, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999) ("Under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."). 2 *Apprendi* focused its inquiry on the role of the petit jury in adjudicating guilt, finding that it "is unconstitutional for a legislature to remove from the jury{2003 U.S. Dist. LEXIS 8} the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (quoting *Jones*, 526 U.S. at 252-53 (Stevens, J, concurring)).

In *Ring*, the Supreme Court applied the lessons of *Apprendi* to the oft-litigated death penalty scheme in Arizona. In *Ring*, the Defendant was charged with violating Ariz. Rev. Stat Ann. § 13-1105(C){2003 U.S. Dist. LEXIS 9} after he allegedly murdered the driver of an armored car. *Ring*, 122 S. Ct. at 2434. The statute "prescribes that the offense 'is punishable by death or life imprisonment as provided by § 13-703.'" *Id.* (quoting Ariz. Rev. Stat. Ann. § 13-1105(C)). Once a determination of factual guilt is made under § 13-1105(C), section 13-703 directs the trial judge to then "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated] circumstances . . . for the purpose of determining the sentence to be imposed." *Id.* The hearing, as provided in § 13-703, "shall be conducted before the court alone. The court alone shall make all factual determination required by this section or the constitution of the United States or this state." *Id.* The trial judge weighs a series of enumerated aggravating factors against any mitigation evidence presented by the defendant. A death sentence may then be imposed "if there is at least

3yfcases                                      1

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

one aggravating circumstance and 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.* at 2435 (quoting Ariz. Rev. Stat. Ann. § 13-703(F){2003 U.S. Dist. LEXIS 10} ).

After the jury convicted Ring of felony murder, the trial judge conducted the requisite hearing and sentenced Ring to death. The Arizona Supreme Court affirmed the conviction, relying on the opinion of the Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990), where the Supreme Court had overtly approved of the Arizona death penalty statutory scheme. Ring sought a writ of certiorari, based on *Apprendi.*

In *Ring,* the Supreme Court reversed its *Walton* opinion, holding that *Apprendi* overruled the prior case. *See Ring,* 122 S. Ct. at 2443 ("Accordingly, we overrule *Walton* to the extend that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." (citation omitted)). The Court noted that "based solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* at 2437. This is the case under Arizona law because "a death sentence may not legally be imposed . . . unless at least one aggravating factor is found to exist beyond a reasonable doubt.{2003 U.S. Dist. LEXIS 11} " *Id.* Under the statutory scheme in Arizona, this determination -- a factual finding based on evidence presented at an additional, post-trial hearing -- was made by the judge alone, sitting without a jury.

> If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact -- no matter how the State labels it -- must be found by a jury beyond a reasonable doubt. A defendant may not be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone. *Id.* at 2439-40 (internal citations and quotations omitted).

Thus, "in effect, the required finding of an aggravated circumstance exposed Ring to a greater punishment than that authorized by the jury's guilty verdict." *Id.* at 2440. Under *Apprendi,* such factual findings are required to be submitted to the jury for a finding beyond a reasonable doubt, as the "enumerated factors operate as 'the functional equivalent of an element of a greater offense'" required by the Sixth Amendment to "be found by a jury." *Id.* at 2443 (quoting *Apprendi,* 530 U.S. at 494 n. 19). Or, as stated by{2003 U.S. Dist. LEXIS 12} Justices Scalia and Thomas in their concurrence, "what today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed." *Id.* at 2445 (Scalia, J., concurring).

Notably, in filing his appeal with the Supreme Court, Ring did "not contend that his indictment was constitutionally defective. *See Apprendi,* 530 U.S. at 477 n.3, 147 L. Ed. 2d 435, 120 S. Ct. 2348 ('Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury'"')." *Ring,* 122 S. Ct. at 2437 n.4. Relying on this footnote, the Fifth Circuit recently concluded in evaluating the direct appeal of a case under the FDPA that "*Ring* did not hold that indictments in capital cases must allege aggravating and mental state factors." *United States v. Bernard,* 299 F.3d 467, 488-89 (5th Cir. 2002). However, within a week of deciding *Ring,* the Supreme Court issued the following cryptic order in *Allen v. United States,* 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002):

> On petition for writ of certiorari to the United States Court of Appeals{2003 U.S. Dist. LEXIS 13} for the Eighth Circuit. Motion of petitioner for leave to proceed *in forma pauperis* and petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Eighth Circuit for further consideration in light of *Ring v. Arizona,* 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

3yfcases 2

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

*Allen* involved the conviction under the FDPA of a group of armed bank robbers who, during the course of robbing a bank in Saint Louis, Missouri, murdered one of the bank's security guards. *See Allen*, 247 F.3d 741, 755 (8th Cir. 2001), *vacated and remanded*, 536 U.S. 953, 153 L. Ed. 2d 830, 122 S. Ct. 2653 (2002). On appeal, the defendants pled a litany of constitutional defects in both the FDPA and the events that occurred during their arrest and trial. Among these challenges, as relevant to the case at bar,

> Allen specifically argues that his sentence was imposed in violation of the Fifth Amendment's Indictment Clause because the FDPA fails to require that the decision to seek the death penalty, just like the decision to charge a defendant with a federal offense, be routed through the Grand Jury.{2003 U.S. Dist. LEXIS 14} Allen also argues that the government's failure to allege in his indictment both the mental culpability factor from § 3591(a) and the aggravating factors from § 3592(c) upon which it relied during the sentencing as the justification for imposing a death sentence constitutes constitutional error in light of the Supreme Court's recent rulings in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999). *Allen*, 247 F.3d at 761.

The Eighth Circuit began by rejecting the initial Fifth Amendment challenge. It noted that because "§ 2113(e) . . . specifically authorize[s] the death penalty as punishment for any defendant found guilty of the listed offense, the Fifth Amendment's Indictment Clause is satisfied." *Id.* at 762. The court concluded that the aggravating factors set forth in the FDPA "do not increase the maximum sentence set forth in each of the statutes for the specific offenses alleged in the indictment and thus do not amount to separate elements that must be alleged in the indictment." *Id.*{2003 U.S. Dist. LEXIS 15} (citing *Apprendi*, 530 U.S. at 489-490; *Jones*, 526 U.S. at 251).

It then turned to the *Apprendi* issue, the "contention that aggravating factors and mental culpability factors must be alleged in an indictment in order to satisfy the Fifth Amendment." *Allen*, 247 F.3d at 762. First, the court noted that "the structure of the two statutes indicates that neither factor is an element of the offense of conviction . . . . Congress did not make the mental culpability factors or statutory aggravating factors elements of the underlying offense." *Id.* at 762-63. It next evaluated whether, as with the New Jersey statute in *Apprendi* or the Arizona death penalty statute in *Ring*, "the mental culpability factors and statutory aggravating factors are deemed elements of the crime by virtue of being facts which are the basis for increasing the maximum punishment." *Id.* at 763 (citing *Apprendi*, 530 U.S. at 489-90); *see also Apprendi*, 530 U.S. at 501 (Thomas, J., concurring) ("Every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that{2003 U.S. Dist. LEXIS 16} mitigates punishment)" is an element of the crime; thus, "the aggravating fact is an element of the aggravated crime."). The court concluded:

> We think that when read in the context of the Supreme Court's decisions interpreting the Eighth Amendment in death cases over the past two decades, these two features of the FDPA [mental culpability factors and statutory aggravating factors] are properly characterized as sentencing protections that shield a defendant from automatically receiving the statutorily authorized death sentence. *Allen*, 247 F.3d at 763.

Instead of viewing a conviction under 18 U.S.C. § 2113(e) as "assuming that a life sentence is the initial baseline" from which a jury could depart upward to a sentence of death under the FDPA, the Eighth Circuit found that the statute expressly authorizes "a maximum penalty of death and the sentencing factors of mental culpability and aggravating circumstances do not increase the sentencing range but rather provide the particularized standards for choosing which of the alternative available sentences should be imposed." *Id.* In arriving at this conclusion, however, the court{2003 U.S. Dist. LEXIS 17} relied directly on the opinion of the Supreme Court in *Walton. See Allen*, 247

3yfcases                                    3

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

F.3d at 764 ("*See Walton*, 497 U.S. at 648, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (explaining that aggravating circumstances are not separate penalties or offenses but rather are "standards to guide the making of the choice between the alternative verdicts of death and life imprisonment") (quoting *Poland v. Arizona*, 476 U.S. 147, 156, 106 S. Ct. 1749, 90 L. Ed. 2d 123 (1986)).").

*Ring* overruled this view of the Arizona death penalty scheme. *See Ring*, 122 S. Ct. at 2443 ("For the reasons stated, we hold that *Walton* and *Apprendi* are irreconcilable; our *Sixth Amendment* jurisprudence cannot be home to both. Accordingly, we overrule *Walton* . . . because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'. . . ." (quoting *Apprendi*, 530 U.S. at 494 n.19) (emphasis added)). Importantly, the ruling in *Ring* rests solely on the Sixth Amendment question of whether or not the aggravating factors must be found by a jury and does not, as the Fifth Circuit noted in *Bernard*{2003 U.S. Dist. LEXIS 18} , address the adequacy of the indictment under the Fifth Amendment. *Bernard*, 299 F.3d 467, 488-89; *see Ring*, 122 S. Ct. at 2437 n.4.

The Court does not attribute the same significance to this notation as does the Fifth Circuit. The Supreme Court held well over one hundred years ago that the indictment protections found in the Fifth Amendment do not apply to the states, and it has not wavered from that opinion. *See Hurtado v. California*, 110 U.S. 516, 28 L. Ed. 232, 4 S. Ct. 111 (1884). Therefore, Ring (like Apprendi) could not rely on the Fifth Amendment in challenging his conviction. Indeed, the Supreme Court noted this fact in the text of the *Apprendi* opinion: "That Amendment [the Fourteenth Amendment] has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' . . . . We thus do not address the indictment question separately today." *Apprendi*, 530 U.S. at 477 n.3.

Pennington, however, does enjoy the protections of the Fifth Amendment's Grand Jury clause, as did Allen. Although the *Ring* opinion discusses its view of the aggravating factors in light of the Sixth{2003 U.S. Dist. LEXIS 19} Amendment, the opinion in *Jones* indicates that the Court applies a similar view to the requirements of an indictment. *See Cotton*, 122 S. Ct. at 1783 ("In *Apprendi* . . ., we held that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. In federal prosecutions, such facts must also be charged in the indictment." (internal citations, quotation marks, and alterations omitted)).

Taken together with the vacation of the *Allen* opinion, these opinions of the Supreme Court compel the construction of the indictment offered by Pennington -- i.e., the indictment must include the mental intent and statutory aggravating factors in order to charge a capital offense. Like the Arizona statute at issue in *Ring*, 18 U.S.C. § 2113(e) allows the imposition of a death sentence only through the incorporation of a different statute. *Compare* Ariz. Rev. Stat. Ann. § 13-1105(C) (murder "is punishable by death or life imprisonment as provided by § 13-703") *with* 18 U.S.C. § 2113(e){2003 U.S. Dist. LEXIS 20} ("Whoever, in committing any offense defined in this section . . . kills any person . . . shall be punished by death or life imprisonment") *and* 18 U.S.C. § 3591(a)(2) ("A defendant who has been found guilty of any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at a hearing under section 3593 intentionally killed the victim . . . shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593 . . . ."). Like in Arizona, before a death sentence may be imposed by a federal court, the factfinder is required to find certain additional factors -- factors that do not appear in the substantive statute defining the crime. A sentence of death under the FDPA is "contingent on the finding of a fact" beyond that required to convict the defendant of the substantive crime. *Ring*, 122 S. Ct. at 2439 (citation omitted). Because the enumerated aggravating factors and mental intent findings in the FDPA both "operate as 'the

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

functional equivalent of an element of a greater offense,'" *id.* at 2443 (quoting{2003 U.S. Dist. LEXIS 21} *Apprendi*, 530 U.S. at 494 n.19), those "elements must be charged in the indictment." *Jones*, 526 U.S. at 232. 3

{2003 U.S. Dist. LEXIS 22} III. IMPLIED INCLUSION

Here, as pointed out by Pennington in his brief, jeopardy has already attached for purposes of the Double Jeopardy clause. *See United States v. Bearden*, 274 F.3d 1031, 1037-38 (6th Cir. 2001) ("We hold that jeopardy attaches only when the district court accepts the defendant's guilty or nolo contendere plea."). 4 Therefore, the Government may not return to the Grand Jury to obtain a superseding indictment. *Cf. United States v. Fisher*, 871 F.2d 444, 451 n.7 (3d Cir. 1989) ("A superseding indictment maybe obtained by the government at any time prior to trial.") (citing *United States v. Edwards*, 777 F.2d 644, 649 (11th Cir. 1985)); *United States v. Bowen*, 946 F.2d 734, 736 (10th Cir. 1991) (same); *United States v. Kouri-Perez*, 47 F. Supp. 2d 166, 169 (D.P.R. 1999) (same) (citing *United States v. Del Vecchio*, 707 F.2d 1214, 1216 (11th Cir. 1983); *United States v. Stricklin*, 591 F.2d 1112, 1115 n.1 (5th Cir. 1979)).

{2003 U.S. Dist. LEXIS 23} The Government argues that there is no need to obtain a superseding indictment because the statutory aggravating factors and mental states are included in the existing indictment by implication. The Indictment alleges that

on or about February 13, 2001, in the Western District of Kentucky, Jefferson County, Kentucky, the defendants, Tiffany Dominique Pennington and Derrick Djuan Moore, each aided and abetted by the other, by force, violence, and intimidation took from bank employees approximately $ 3,760.00 in money belonging to and in the care, custody, control, management, and possession of the National City Bank, 3800 Brownsboro Road, Louisville, Kentucky, the deposits of which were then and there insured by the Federal Deposit Insurance Corporation, and in committing such offense, the defendants did kill a bank employee whose identity is known to the Grand Jury.(Indictment at 3.)

In its Notice of Intent to Seek the Death Penalty (Dkt. # 42), the Government elected to pursue the following three alternative mental states: (1) intentionally inflicting serious bodily injury that results in the death of the victim, 18 U.S.C. § 3591(a)(2)(B); {2003 U.S. Dist. LEXIS 24} (2) intentionally participating in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, where the victim dies as a direct result of the act, 18 U.S.C. § 3591(a)(2)(C); and (3) intentionally and specifically engaging in an act of violence, knowing that the act creates a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constitutes a reckless disregard for human life, and the victim dies as a direct result of the act, 18 U.S.C. § 3591(a)(2)(D). (Dkt. # 42 at 2.) Further, it gave notice of two statutory aggravating factors: (1) knowingly creating a grave risk of death to other persons in addition to the victim of the offense during the course of the offense, 18 U.S.C. § 3592(c)(5); and (2) committing the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value, 18 U.S.C. § 3592(c)(8). (Dkt. # 42 at 3.)

The Government contends that the intent{2003 U.S. Dist. LEXIS 25} factors are included in the Indictment because Count 3 states that the Defendant committed the offense of bank robbery -- an act of violence -- and that during the course of the robbery he killed a bank employee. This language, the Government asserts, sufficiently informs the Mr. Pennington of the charges against him. The Government makes a similar argument regarding the statutory aggravating factor of pecuniary gain, 5 maintaining that "although not phrased in the same language as 18 U.S.C. § 3592(c)(8), the plain language of Count 3 of the Indictment provides fair notice to the defendant of

3yfcases                                          5

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the aggravating factor of pecuniary gain." (Dkt. 199 at 5.)

What the Government's contentions fail to address, however, is that an indictment serves three distinct functions: (1) it presents the essential elements of{2003 U.S. Dist. LEXIS 26} the charged offense for the grand jury's consideration; (2) it notifies the accused of the of the charges to be defended against; and (3) it enables the accused to plead an acquittal or conviction as a bar to subsequent prosecutions for the same offense. See United States v. Woodruff, 296 F.3d 1041, 1046 (11th Cir. 2002); United States v. Stubbs, 279 F.3d 402, 407 (6th Cir. 2002). An indictment is required to present the offense's essential elements not merely to notify the defendant of the charges against him, but to ensure that the grand jury finds probable cause to believe that the accused committed each element of the offense. United States v. Cabrera-Teran, 168 F.3d 141, 143 (5th Cir. 1999); see United States v. Hart, 640 F.2d 856, 857 (6th Cir. 1981). If an essential element is not expressly included in the indictment, the grand jury's role of determining probable cause is circumvented as to that omitted element.

In some cases, an omitted element can be impliedly included in an indictment because a finding of probable cause upon the indictment's contents necessarily includes a finding of probable cause as to{2003 U.S. Dist. LEXIS 27} that omitted element. For example, here, it would be possible to read intent to rob into the fact that the indictment alleged that Pennington committed the offense of bank robbery. See United States v. Woodruff, 296 F.3d 1041, 1048 (11th Cir. 2002) ("It is difficult to imagine how a person could 'unlawfully take and obtain personal property . . . by means of actual and threatened force, violence, and fear of immediate injury' by mistake or accident. The very use of the tools of violence . . . for the specific purpose of taking the property of another can only be imagined as being done knowingly -- that is, voluntarily and intentionally."); United States v. Hodge, 211 F.3d 74, 77-78 (3d Cir. 2000). However, the mere fact that a defendant intentionally committed the crime of bank robbery does not necessarily imply that the defendant either (1) intended to inflict serious bodily injury upon anyone, (2) contemplated that a person's life would be taken or intending that lethal force be used against someone, or (3) intentionally and specifically engaged in an act of violence, knowing that the act creates a grave risk of death to another person, such that{2003 U.S. Dist. LEXIS 28} the defendant's conduct constitutes a reckless disregard for human life. Similarly, the mere fact that the bank robbery was obviously committed "as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value" does not necessarily imply that the victim was killed for that reason. 6 It would be possible, for example, for an accused to intentionally commit bank robbery and then accidentally run over an absentminded and at-fault pedestrian while driving away from the bank, or to fling open the door to the bank, inadvertently hitting a passer-by with the door and causing the passer-by to fall and suffer a fatal head injury. With regard to the "pecuniary gain" aggravator, it is also possible that a bank robber could kill a victim to prevent that person from revealing the thief's identity. See Bernard, 299 F.3d at 483-84 (pecuniary gain aggravator inapplicable where evidence established that defendants killed their victims to prevent them from reporting the robbery to the police). 7

Thus, while it is true that "an indictment must be 'read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied,'" Samuels v. United States, 16 F.3d 1221 (table), 1994 U.S. App. LEXIS 2699, 1994 WL 47796, at *2 (6th Cir. Feb. 15, 1994) (quoting United States v. Martin, 783 F.2d 1449, 1452 (9th Cir. 1986)), it by no means certain that the requisite mens rea and pecuniary gain statutory aggravating factor are impliedly included in Pennington's Indictment. Correspondingly, the mental state and pecuniary gain statutory aggravating factor are not necessarily included by implication in the Grand Jury's{2003 U.S. Dist. LEXIS 30} finding of probable cause upon that indictment. While the indictment's notice function (as well as its double jeopardy function) might not be offended by reading intent and pecuniary gain into

3yfcases

6

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

Pennington's Indictment, such implied inclusion cannot be accomplished without trampling upon the prerogative of the Grand Jury to evaluate probable cause as to every essential element of the offense.

IV. "WAIVER" 8

{2003 U.S. Dist. LEXIS 31} As a general matter, a "plea of guilty by a prisoner in open court constitutes an admission of guilt and waiver of all non-jurisdictional defects and defenses, and admits all facts alleged in the indictment." *United States v. Parker*, 292 F.2d 2, 3 (6th Cir. 1961); accord *Smith v. United States*, 447 F.2d 487, 488 (5th Cir. 1971) ("As the district court correctly held, a valid plea of guilty constitutes a waiver of all non-jurisdictional defects and defenses." (citations omitted)); *Weisberg v. Minnesota*, 29 F.3d 1271, 1279 (8th Cir. 1994) ("As a general rule, a defendant's knowing and intelligent guilty plea forecloses independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."). Although it was not entirely clear at the time of Pennington's original motion whether he waived his *Apprendi/Ring* objection to the Indictment by pleading guilty, the issue now seems to be settled in this Circuit in light of the recent decision of *United States v. Stewart*, 306 F.3d 295 (6th Cir. 2002), cert. denied, 537 U.S. 1138, 154 L. Ed. 2d 832, 123 S. Ct. 930 (2003), and 537 U.S. 1146, 154 L. Ed. 2d 847, 123 S. Ct. 946 (2003).{2003 U.S. Dist. LEXIS 32} In *Stewart*, a large group of defendants were indicted for participation in an extensive drug conspiracy. "However, the superseding indictment failed to allege the quantity of drugs attributable to each Defendant . . . ." *Id.* at 303. After guilty pleas by some defendants and guilty verdicts as to other defendants, the trial judge sentenced the defendants to greater terms of imprisonment than would otherwise have been available under the superseding indictment.

No defendant raised an objection to the indictment's omissions prior to adjudication of guilt (either through the entry of a guilty plea or through a jury verdict). However, the court concluded this did not result in the defendants waiving their *Apprendi* objection to the indictment, noting that

> it would be imprudent for defense counsel to object to an indictment which, by all rights, is facially sound. To do so would be in direct opposition to his client's penal interests; the only logical outcome of such a challenge would be for the government to replace the charge under 21 U.S.C. § 841 with a more specific charge, specifically alleging a drug quantity, which might expose the defendant{2003 U.S. Dist. LEXIS 33} to a higher statutory penalty range. Instead of objecting to a valid indictment or jury instruction, the proper time for a defendant to raise a challenge to his sentence is at the time the actual violation occurs -- at the time of sentencing. *Id.* at 310 (citing *United States v. Jackson*, 240 F.3d 1245, 1248 (10th Cir. 2001)); accord *United States v. Candelario*, 240 F.3d 1300, 1304-05 (11th Cir. 2001). The court then evaluated the case, and concluded that the two defendants who went to trial had properly preserved their *Apprendi* error claims to both the indictment and adjudication of drug quantity by the jury because they raised the claims at the sentencing hearing. *Stewart*, 306 F.3d at 312 ("While before the district court, the Benfords contended that the *Jones* decision required that the drug amounts be charged in their indictments . . . .").

In light of *Stewart*, it is clear in the Sixth Circuit that a defendant does not waive his *Apprendi* objection by entering a guilty plea upon a "defective" 9 indictment. Consequently, Pennington did not waive his ability to raise an *Apprendi* challenge to the Indictment{2003 U.S. Dist. LEXIS 34} by pleading guilty. 10

{2003 U.S. Dist. LEXIS 35} V. THE CONSEQUENCE OF THE INDICTMENT'S OMISSIONS

Having determined that the Indictment does not properly charge a capital offense, that Pennington

3yfcases                                7

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

has not waived his right to object to the Indictment's omissions, and that the Government cannot remedy the omissions by returning to the Grand Jury to obtain a superseding indictment, the Court is now faced with the difficult task of determining what effect the Indictment's failure to include the "eligibility" requirements -- at least one statutory aggravating factor from 18 U.S.C. § 3592(c) and mental culpability requirement of 18 U.S.C. § 3291 -- has upon the present case. As in *Stewart*, the question thus becomes "how to resolve the [Defendant's] *Apprendi* challenges." *Stewart*, 306 F.3d at 318.

In *Stewart*, the Sixth Circuit (looking to the Supreme Court's decision in *Cotton, supra*) adopted the view expressed by the Tenth Circuit in *United States v. Prentiss*, 256 F.3d 971 (10th Cir. 2001) (en banc), that "an indictment's failure to allege an element of a crime is not jurisdictional in the sense that it affects a court's subject{2003 U.S. Dist. LEXIS 36} matter jurisdiction, i.e., a court's constitutional or statutory power to adjudicate the case." *Id.* at 321 (quoting *Prentiss*, 256 F.3d at 982 (internal citation and alteration omitted)). It also rejected the view that omission of drug quantity from the indictment constitutes "structural error." 11 *Id.* Relying on *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999), the court noted that the Supreme Court "has identified 'a limited class of fundamental constitutional errors that defy analysis by harmless error standards.'" *Id.* (quoting *Neder*, 527 U.S. at 7).

Structural errors require automatic reversal, despite the effect of the error on the trial's outcome. *Id.* As for all other errors, "courts *must* apply Fed. R. Crim. P. 52(a)'s harmless error standards, and disregard errors that are harmless beyond a reasonable doubt. *Neder*, 527 U.S. at 7, 144 L. Ed. 2d 35, 119 S. Ct. at 1833 (emphasis in original). The error complained of in the instant case is not among those listed in *Neder* that classify as structural. *Id.* (footnote omitted).

{2003 U.S. Dist. LEXIS 37} Since *Apprendi* errors are neither jurisdictional nor structural, the *Stewart* decision seems to indicate that a court reviewing an ordinary *Apprendi* challenge to the indictment, properly objected to by the defendant, applies the harmless error standard in Fed. R. Crim. P. 52(a). 12 *See Stewart*, 306 F.3d at 322 ("Harmless error analysis is appropriate under the facts of this case."); *see also United States v. Copeland*, 304 F.3d 533, 554, 556 (6th Cir. 2002) (following *Stewart* in applying harmless error analysis to defendant's objection to trial court's drug quantity determination), *cert. denied*, 537 U.S. 1145, 123 S. Ct. 950, 154 L. Ed. 2d 845 (2003); *Candelario*, 240 F.3d at 1306-07 (preserved *Apprendi* errors subject to harmless error review). Thus, it appears to logically follow that the harmless error standard in Fed. R. Crim P. 52(a) should apply to the current circumstance. After all, the omitted statutory aggravating factors and mental culpability requirements are analytically no different than the omitted drug{2003 U.S. Dist. LEXIS 38} quantity in *Stewart*.

{2003 U.S. Dist. LEXIS 39} However, the fact that only the former provides an avenue for application of the death penalty makes the two otherwise close conceptual analogues significantly dissimilar. "Death is a different kind of punishment from any other which may be imposed in this country." *Gardner v. Florida*, 430 U.S. 349, 357, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977) (plurality). Indeed, "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976) (plurality); *see Gardner*, 430 U.S. at 360 (plurality) ("The extinction of all possibility of rehabilitation is one of the aspects of the death sentence that makes it different in kind from any other sentence a State may legitimately impose."); *Furman v. Georgia*, 408 U.S. 238, 306, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) (Stewart, J., concurring) ("The penalty of death . . . is unique in its total irrevocability[;] . . . unique in its rejection of rehabilitation[;] . . . [and] unique . . . in{2003 U.S. Dist. LEXIS 40} its absolute renunciation of all that is embodied in our concept of humanity.").

3yfcases                                                    8

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

"From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action." *Gardner*, 430 U.S. at 357. Defendant argues that this difference makes harmless error analysis inappropriate in the present context.

The Supreme Court, however, has applied harmless error review to cases involving the death penalty. *See, e.g., Jones v. United States*, 527 U.S. 373, 402-05, 144 L. Ed. 2d 370, 119 S. Ct. 2090 (1999); *Sochor v. Florida*, 504 U.S. 527, 532, 539-41, 119 L. Ed. 2d 326, 112 S. Ct. 2114 (1992); *Clemons v. Mississippi*, 494 U.S. 738, 752-53, 108 L. Ed. 2d 725, 110 S. Ct. 1441 (1990). 13 Admittedly, the Supreme Court has not applied the harmless error test to an *Apprendi* error in a capital case. Nonetheless, the Supreme Court's use of the harmless error standard in the capital setting indicates that the Court does not believe that a harmless error analysis is categorically inappropriate in a capital{2003 U.S. Dist. LEXIS 41} case. Further, 18 U.S.C. § 3595(c)(2) provides that federal death sentences are not to be set aside on appeal based upon errors that are harmless beyond a reasonable doubt.

Considered together, the analytical near-indistinguishability between the drug cases and the present case, the Supreme Court's previous use of harmless error review in capital cases, and § 3595(c)(2)'s mandate of a harmless error standard on appellate review of federal death sentences lead this Court to conclude that *Apprendi* errors in capital sentencing must be subject to a harmless error review. Although the Court is aware that "death is different," an indictment's{2003 U.S. Dist. LEXIS 42} failure to include the "functional equivalent of elements" statutory aggravating factors and mental state requirements is not significantly dissimilar from an indictment's omission of the "functional equivalent of an element" drug quantity, which is unquestionably subject to harmless error review under *Stewart*. *See Bernard*, 299 F.3d at 489 (applying plain error analysis to defendant's unpreserved objection that mental state and statutory aggravating factors were not alleged in the indictment or found by the grand jury).

Although the harmless error inquiry is generally appropriate in cases where the death penalty is sought, it does not necessarily follow that harmless error review is appropriate in this case. Because Pennington's objection comes prior to the sentencing phase, the Court is put in a position much different than that of an appellate court reviewing a defendant's *Apprendi* objection. There, the error -- imposing a sentence not authorized by the indictment and/or jury verdict -- has already occurred, and the appellate court may examine the committed error in the larger context of the record as a whole. Here, however, no error has yet occurred, so a harmless{2003 U.S. Dist. LEXIS 43} error review would essentially require that the Court first admit it should not allow the Government to pursue the death penalty, then proceed to determine the effect of its admitted error. 14 Such an approach is both illogical and improper. *Davis*, No. 94-381, Dkt. # 1080, at 18 n.25. Accordingly, the Government, having failed to allege in the Indictment or submit to the Grand Jury the statutory aggravating factors and mens rea requirements, cannot seek the death penalty against Mr. Pennington.

Even if harmless error review were appropriate in the present circumstance, the error here cannot be{2003 U.S. Dist. LEXIS 44} considered harmless. Where an infringement upon a constitutional right is subject to a harmless error inquiry, the court may only correct the error where (1) there was in fact an error, (2) that was plain, and (3) that affected substantial rights. *Stewart*, 306 F.3d at 322. The "government bears the burden of showing that the error had no effect on a defendants' substantial rights." *Id.*

Based upon the previous discussion, *supra* Part II, it is apparent that both the first and second prongs have been met. *See Johnson v. United States*, 520 U.S. 461, 467-68, 137 L. Ed. 2d 718, 117 S. Ct.

3yfcases

9

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

1544 (1997) (error is "plain" where it is clear or obvious at the time of either trial or appeal). Regarding the third prong, however, there are two competing views of "substantial rights" in the context of *Apprendi* errors. As the Supreme Court acknowledged in *Cotton*, one interpretation is that a defendant's substantial rights are affected any time he is subjected to additional years of imprisonment not authorized by the indictment and/or jury verdict, while a competing view provides that a defendant's substantial rights are only affected when the omitted quasi-element{2003 U.S. Dist. LEXIS 45} is not supported by overwhelming and uncontroverted evidence. *See Cotton*, 122 S. Ct. at 1786 n.2. The Supreme Court declined to resolve the dispute, however, and instead decided *Cotton* on other grounds. *Id* at 1786.

Prior to *Cotton*, the Sixth Circuit adopted the first view of the "substantial rights" determination in *United States v. Page*, 232 F.3d 536, 544 (6th Cir. 2000). *Page* involved defendants who were convicted of drug offenses under 21 U.S.C. §§ 841and 846. Although neither indictment nor jury verdict specified drug quantity, the district court calculated the amount of drugs attributable to each defendant at a sentencing hearing, then sentenced each defendant to a prison term exceeding the applicable baseline sentence range based upon his findings as to drug quantity.

Because the defendants failed to object that the jury, not the district judge, should have made the quantity determination, the court of appeals reviewed the case for plain error. *Id.* at 543. Under the plain error test, a defendant must establish the existence of the three elements required by the harmless error test ((1) {2003 U.S. Dist. LEXIS 46} an error, (2) that was plain, (3) that affected substantial rights) as well as demonstrate that the error "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467, 137 L. Ed. 2d 718, 117 S. Ct. 1544 (1997) (citation and quotation marks omitted). In addition to adding a fourth element, the plain error test differs from the harmless error test in that the burden is on the defendant, not the government, to prove the third prong. *Stewart*, 306 F.3d at 322.

After the panel concluded that there had been an error that was plain, the court turned to the third prong of the plain error/harmless error analysis:

> An error affects substantial rights when the error was prejudicial, that is, when it "affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). There is no doubt that imposing additional years of imprisonment beyond that authorized by a jury's verdict affects a defendant's substantial rights. *See United States v. Barajas-Nunez*, 91 F.3d 826, 833 (6th Cir. 1996) (an error{2003 U.S. Dist. LEXIS 47} affects substantial rights when the error results in a sentence substantially different than that which would have been imposed absent the error). *Page*, 232 F.3d at 544. Applying this conception of the third prong to the facts before it, the panel determined that the lower court's erroneous application of an enhanced penalty range did not affect three of the defendants' substantial rights, as the sentences they received could have been imposed under the baseline statutory penalty ranges. Defendant Page's sentence, however, exceeded the "catchall" sentencing range, and the court vacated his sentence and remanded his case for resentencing. 15 *Id.* at 544-45.

{2003 U.S. Dist. LEXIS 48} The Sixth Circuit has repeatedly followed *Page*'s lead in holding that a defendant's substantial rights are affected whenever he is sentenced to a term of imprisonment exceeding that authorized by a jury's verdict. *United States v. Sandlin*, 291 F.3d 875, 880 (6th Cir. 2002) (per curiam); *United States v. Graham*, 275 F.3d 490, 523 (6th Cir. 2001) (citing *United States v. Martinez*, 253 F.3d 251, 255 (6th Cir. 2001); and *Page*, 232 F.3d at 544); *Gibson v. United States*, 271 F.3d 247, 258 (6th Cir. 2001) (citing *Page*, 232 F.3d at 545); *Martinez*, 253 F.3d at 255 (citing *Page*, 232 F.3d at 545); 16 *accord United States v. Stubbs*, 279 F.3d 402, 413 (6th Cir.

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

2002) (Boggs, J., dissenting) (citing *Page*, 232 F.3d at 544); *see United States v. Lopez*, 309 F.3d 966, 970 (6th Cir. 2002) (defendant's substantial rights were affected because he received a mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) rather than a lesser sentence under § 841(b)(1)(C)); *United States v. Burns*, 298 F.3d 523, 544-45 (6th Cir. 2002){**2003 U.S. Dist. LEXIS 49**} (error did not affect defendant's substantial rights because his sentence was within the baseline statutory maximum); *Stubbs*, 279 F.3d 402, 410 (6th Cir. 2002) (sentencing defendant under 18 U.S.C. § 924(c) when he had been indicted upon and pled guilty to violations of 18 U.S.C. § 924(o) affected his substantial rights) (citing *Page*, 232 F.3d at 544).

{**2003 U.S. Dist. LEXIS 50**} With *Page, Sandlin, Graham, Gibson*, and *Martinez* (as well as *Lopez, Burns* and *Stubbs*), the Sixth Circuit has repeatedly expressed the view that a defendant's substantial rights are affected whenever his sentence is increased as a result of an *Apprendi* violation. On at least three occasions, however, the Sixth Circuit has expressed a conflicting view of the third prong. *See Stewart*, 306 F.3d at 323 ("[A] court reviewing a defendant's sentence in which it finds an *Apprendi* error must look to whether the 'omitted element is supported by uncontroverted evidence,' and also 'ask[] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" (quoting *Candelario*, 240 F.3d at 1308) (second alteration in original)); *United States v. King*, 272 F.3d 366, 378-80 (6th Cir. 2001) (defendants' substantial rights not effected by *Apprendi* error that occurred during sentencing because evidence was uncontroverted and neither defendant objected to manner by which drug quantity determinations were made); *United States v. Stafford*, 258 F.3d 465, 476-78 (6th Cir. 2001){**2003 U.S. Dist. LEXIS 51**} (defendant's factual admission of drug type and quantity obviates any *Apprendi* concerns).

In the first of these cases, *United States v. Stafford*, the defendant was charged with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The indictment did not specify drug quantities. The defendant pled guilty to the charge, and his plea agreement stated that the charged offense carried a term of imprisonment between 10 years and life and that the Government would stipulate to drug quantity of "235.42 grams cocaine-base and 14.48 grams powder cocaine." *Stafford*, 258 F.3d at 468 (quoting Plea Agreement at 3-4). At Stafford's change of plea hearing, both prosecutor, defense attorney, and the defendant himself agreed that he was subject to a ten year mandatory minimum, and the judge informed the defendant that he faced a maximum term of life imprisonment. In his plea colloquy, Mr. Stafford admitted to possessing approximately 241 grams of cocaine base and 14 grams of powder cocaine. *Id.* at 469 (quoting Plea Hearing Tr. at 5). The Presentence Investigation Report ("PSR") stated drug quantity at 235.42{**2003 U.S. Dist. LEXIS 52**} grams of cocaine base and 14.48 grams of powder cocaine, cited the statutory penalty provision of 21 U.S.C. § 841(b)(1)(A), and observed that it called for a term of imprisonment between ten years and life. *Id.* at 469-70 (citing PSR at 1, 18). Defendant did not object to the PSR. *Id.* at 470.

On appeal, Stafford raised an *Apprendi*-based objection, arguing that the drug quantity should have been determined by the jury beyond a reasonable doubt and that the indictment did not survive scrutiny because it was silent as to drug type or quantity. The Sixth Circuit rejected defendant's first argument, reasoning that the "heightened [reasonable doubt] standard of proof would not have altered the sentencing court's resolution of this uncontested factual issue." *Id.* at 476. With regard to Stafford's second argument, the court held that "any alleged defect in the indictment did not affect Defendant's substantial rights" because he had admitted to the quantity of drugs in the plea agreement, had repeatedly been advised of the applicable enhanced sentencing range, and had not been sentenced above the statutory maximum{**2003 U.S. Dist. LEXIS 53**} term for the "catchall" provision, 21 U.S.C. § 841(b)(1)(C), which does not require the government to establish drug quantity. *Id.* at 478. The court also determined that there had been no reversible plain error because

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

the defendant was not sentenced beyond the maximum term set forth in § 841(b)(1)(C). *Id.* at 479 & n.9; *see also id.* at 483 (Clay, J., concurring).

The Sixth Circuit again had the opportunity to revisit the "substantial rights" prong in *United States v. King.* There, two co-defendants argued on appeal that the drug quantity upon which their sentences were based should have been alleged in the indictment and determined by the jury. Both defendants received sentences within their respective "catchall" sentencing ranges, but both had been sentenced under enhancement schemes that increased the mandatory minimum sentence. 17 Applying the plain error test, the court rejected defendants' *Apprendi* objections on the third prong:

> We conclude that the substantial rights of the defendants were not affected by any *Apprendi* error which may have occurred during sentencing. Both defendants{2003 U.S. Dist. LEXIS 54} failed to object to the drug quantity determinations contained in the PSRs despite being on notice that such determinations would affect the length of their sentences. Indeed, King merely objected that the amount in question was closer to 300 grams of actual methamphetamine rather than one kilogram. Moreover, it was the undisputed testimony of a forensic chemist that one package contained 82.8 grams of actual methamphetamine, an amount above the 50 gram amount needed to trigger the defendants' sentences under the applicable statutes. *See* 21 U.S.C. § 841(b)(1)(A). We therefore conclude that any errors in sentencing failed to affect the defendants' substantial rights. *Id.* at 379-80.

Finally, in *Stewart* (the facts{2003 U.S. Dist. LEXIS 55} of which are discussed *supra*), a panel of the Sixth Circuit held that a defendant's substantial rights were unaffected when the record provided no basis for a jury to rationally reach a contrary finding with respect to the "element" that was omitted from the indictment and not submitted to the jury. *Stewart*, 306 F.3d at 323 (citing *Neder*, 527 U.S. at 19; *King*, 272 F.3d at 378; and *Candelario*, 240 F.3d at 1308). 18 Applying this standard to the situation before it, the court found the contrary evidence insufficient to justify reversal. As to co-defendant Nathan Benford, the panel determined that he had failed to challenge the drug quantity assessment and that no evidence called the assessment into doubt. *Id.* at 324-25. Over one dissent, the panel also determined that Rena Benford's sentencing error was also harmless, since the same evidence used against Mr. Benford also applied to her and four separate instances supported the judge's the quantity determination as to her. *Id.* at 332-34. *Contra id.* at 325-26 (Clay, J., dissenting).

{2003 U.S. Dist. LEXIS 56} Although *Stafford* might arguably be distinguishable because it involved a defendant's admission of quantity and also rested on the belief that no *Apprendi* violation had occurred, neither *King* nor *Stewart* are significantly different from the *Page* line of cases to justify the difference in perspective. Further, while all the cases except *Stewart* inquired as to plain, not harmless, error, the analyses of "substantial rights" for both tests are indistinguishable. *See United States v. Olano*, 507 U.S. 725, 734-35, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993); *King*, 272 F.3d at 378; *United States v. Segines*, 17 F.3d 847, 851 (6th Cir. 1994). The two lines of cases simply cannot be reconciled.

Because of this irreconcilable conflict between *Page*'s view of "substantial rights" in *Apprendi* cases and the view espoused by *Stafford, King*, and *Stewart,* the previously-decided *Page* decision controls. *Darrah v. City of Oak Park*, 255 F.3d 301, 310 (2001) (citing *Sowards v. Loudon County, Tenn.*, 203 F.3d 426, 431 n.1 (6th Cir. 2000); and *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 180 F.3d 758, 765 (6th Cir. 1999),{2003 U.S. Dist. LEXIS 57} rev'd on other grounds, 531 U.S. 288, 148 L. Ed. 2d 807, 121 S. Ct. 924 (2001)). Thus, an *Apprendi* error arising from the indictment affects a defendant's substantial rights any time the defendant receives a sentence not authorized by the indictment, regardless of the strength of the evidence presented upon the omitted

3yfcases                                    12

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

penalty enhancer. While such errors often will be uncorrectable under plain error review, see Cotton, supra, they cannot be considered harmless. 19 Accordingly, sentencing Mr. Pennington to death in the current case would be improper even were the Court to apply harmless error review.

{2003 U.S. Dist. LEXIS 58} In addition to being the result dictated by this Circuit's rule of precedent, adoption of the Page rule makes better sense. Where the Apprendi quasi-elements are omitted from an indictment, the sentencing error is one of wholly unjustified term, not merely one of an unjustified means of reaching a justified term. 20 In other words, even if a jury determines the statutory mental state and aggravating factors beyond a reasonable doubt, the error maintains -- as the error is the exposure to enhanced sentencing itself, not the mere method of exposure. Accordingly, if the error arises in imposing a sentence unjustified by the indictment under any circumstances (whether the factual prerequisite is found by a jury beyond a reasonable doubt of a judge by a preponderance of the evidence), it is nonsensical to argue that the error could not have contributed to the verdict obtained. But for the error, the sentence necessarily would have been within the lower statutory range.

{2003 U.S. Dist. LEXIS 59} It is therefore incongruous to first hold that an Apprendi violation lies only in sentencing and not in the indictment, and then hold that the sentencing error (one of unjustified term) is harmless when the evidence justifying the unauthorized increased term is overwhelming. The error ipso facto is harmful, and the Stafford-King-Stewart framing of the "substantial rights" review is inappropriate. 21

The tortuous and problematic effort of making this harmless error analysis is obvious. As noted in Stewart, 306 F.3d at 310, the{2003 U.S. Dist. LEXIS 60} constitutional error does not lie with indictment itself. Instead, the error occurs at sentencing, which has not happened at this time. Consequently, the preemptive analysis is difficult and probably inappropriate considering the procedural timeline of this case.

## CONCLUSION

This case is procedurally unique. It may be factually and procedurally one-of-a-kind. After several hearings, Defendant pled guilty to the charges in the indictment and the Court accepted that plea. All agree that jeopardy attached to the indictment, for which the Defendant stands convicted.

The Court finds that Ring, Jones and Apprendi compel the conclusion that in a federal capital case, the grand jury must find the FDPA intent and aggravating factors upon which the death penalty is requested and must set forth those findings in the indictment. This is because the mental intent findings and aggravating factors "operate as 'the functional equivalent of an element of a greater offense.'" Ring, 122 S. Ct. at 2443 (quoting Apprendi, 530 U.S. at 494 n.19). Accordingly, these "functional equivalents of elements" must be charged in the indictment to satisfy the Defendant's{2003 U.S. Dist. LEXIS 61} Fifth Amendment rights.

The Court has agonized over this conclusion for several months. In one sense, there is a common sense analysis that says "let a jury" decide beyond a reasonable doubt whether the Defendant should received the death penalty. After all, the Government did comply with FDPA as understood prior to Ring. Before the plea was accepted, the death notice was provided to Defendant, and Defendant was given an opportunity to withdraw his plea of guilty. Consequently, prior to his plea, he had notice from the Government as to the factors it considered mandated the death penalty. All of these facts make the procedural posture of this case unparalleled.

Nevertheless, the Fifth Amendment provides in part, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." This protection applies to the guilty and the innocent, and to those deserving of a second chance and to those who

3yfcases                    13

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

arguably have forfeited that opportunity. It applies to all.

The Defendant was given ninety days after the filing of the death notice to withdraw his offer of a plea before the Court accepted it. The Government had the same{2003 U.S. Dist. LEXIS 62} time to file a superseding indictment and cure flaws in its original indictment. Most likely, neither party considered the profound implications of *Ring*.

A district court does not have the option of following its personal preference in the face of existing precedent. If so, the decision in this case may have been different. Instead, district courts have the duty to following existing law.

At the same time, the law does not exist in a vacuum. The Court recognizes all rulings affect individuals and have a real life impact. No effort by the Court can heal the pain to the victim's family. This ruling places Mr. Pennington in prison for the rest of his life. Probably to the disappointment of the victim's family, it does not allow a jury to determine whether the Defendant should receive the death penalty. The Court must follow what appears to it to be existing law.

The Defendant was entitled to have a grand jury make a finding through an indictment of the aggravating factors and mental intent set forth in the FDPA. Under the singular circumstances of this case, the Court must conclude that the Fifth Amendment prohibits further capital proceedings.

This is the 19 day of February, {2003 U.S. Dist. LEXIS 63} 2003.

Thomas B. Russell, Judge

United States District Court

## ORDER

This matter having come before the Court on motions of the Defendant to preclude imposition of the death penalty (Dkt. Nos. 175 & 198), the Court having received substantial additional briefing regarding the same (*see* Dkt. Nos. 193, 195, 197, 203-04, 208-09, 211-12, 228-29, & 232-33), and otherwise being sufficiently advised,

## IT IS ORDERED:

The motions (Dkt. Nos. 175 & 198) are **GRANTED**. The Government is prohibited from seeking the death penalty against Defendant, and the Court hereby **STRIKES** the Government's Notice of Intent to Seek the Death Penalty (Dkt. # 42).

This is the 19 day of February, 2003.

Thomas B. Russell, Judge

© 2019 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

# APPENDIX D

**UNITED STATES v. BILLIE J. ALLEN**          No. 4:97CR141 ERW (TCM)

INSTRUCTION NO. _20_

## FIREARMS - CRIME OF VIOLENCE/ WHICH RESULTS IN A MURDER

The crime of using or carrying a firearm during and in relation to a crime of violence which results in a murder, as charged in Count II of the indictment has four essential elements, which are:

*One*, the defendant committed the crime of bank robbery as charged in Count I;

*Two*, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm;

*Three*, that in the course of committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, caused the death of Richard Heflin by the use of a firearm; and

*Four*, the killing of Richard Heflin was murder.

Murder is the unlawful killing of a human being with malice aforethought.

"Malice aforethought" means an intent, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life, but "malice aforethought" does not necessarily imply any ill will, spite or hatred towards the individual killed. "Malice," as the term is used here, is but another name for a certain state or condition of a person's mind or heart. Since no one can look into the heart or mind of another, the only means of determining whether or not malice existed at the time of a killing is by inference drawn from the surrounding facts and circumstances, as shown by the evidence in the case.

In determining whether Richard Heflin was unlawfully killed with malice aforethought, the jury should consider all the facts and circumstances preceding, surrounding and following the killing, as shown by the evidence in the case, which tend to shed light upon the condition of mind and heart of the killer, before and at the time of the deed. No fact, no matter how small, no circumstance, no matter how trivial, which bears upon the question of malice aforethought

353

should escape careful consideration by the jury.

The phrase "used a firearm" means that the firearm was actively employed in the course of the commission of the bank robbery. You may find that a firearm was used during the commission of the bank robbery if you find that it was brandished, displayed, or fired.

For you to find the defendant guilty of the crime charged under Count II, the government must prove all of these essential elements beyond a reasonable doubt otherwise you must find the defendant not guilty of this crime under Count II.

8th Circuit Manual of Model Criminal Jury Instructions 6.18.924 [Modified]
Devitt & Blackmar, Federal Jury Practice and Instructions, (3d. Ed. 1977) Section 41.05
Title 18 United States Code, Section 924(c)
Title 18 United States Code, Section 924(j)(1)
Title 18 United States Code, Section 1111

*Given*
2/26/98
T. Richard Mehli
U.S.D.J.

354

# APPENDIX E

UNITED STATES V. BILLIE J. ALLEN          No. 4:97CR141ERW(TCM)

INSTRUCTION NO. _22_

## FIREARMS - CRIME OF VIOLENCE

If your verdict under Instruction No. _20_ under Count II is not guilty, or if, after all reasonable efforts, you are unable to reach a verdict on Instruction No. _20_, you should record that decision on the verdict form and go on to consider whether the defendant is guilty of the crime of using or carrying a firearm during and in relation to a crime of violence.

The crime of using or carrying a firearm during and in relation to a crime of violence has three essential elements, which are:

*One*, the defendant committed the crime of bank robbery as charged in Count I;

*Two*, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm; and

*Three*, that in the course of committing the crime of bank robbery as charged in Count I, while knowingly using or carrying a firearm, the defendant, or a person aided or abetted by the defendant, caused the death of Richard Heflin by the use of a firearm.

The phrase "used a firearm" means that the firearm was actively employed in the course of the commission of the bank robbery. You may find that a firearm was used during the commission of the bank robbery if you find that it was brandished, displayed, or fired.

For you to find the defendant guilty of the crime of using or carrying a firearm during and in relation to a crime of violence, the government must prove all of these essential elements beyond a reasonable doubt; otherwise, you must find the defendant not guilty of this crime.

359

<u>8th Circuit Manual of Model Criminal Jury Instructions</u> 3.10, 6.18.924[Modified]
Devitt & Blackmar, <u>Federal Jury Practice and Instructions</u>. (3d Ed. 1977) §41.05
Title 18 United States Code, Section 924(c)
Title 18 United States Code, Sections 924(j)(1); (J)(2)

*Hueen*

*2/26/98*

*G. Arhard Mikh*

*A.S.D.J.*

360

# APPENDIX F

UNITED STATES v. BILLIE J. ALLEN                    No. 4:97CR141 ERW (TCM)

INSTRUCTION NO. __25__

The phrase "carries a firearm" means to bear the firearm on or about the person so long

as it is located in such proximity to the person as to be convenient of access and within reach.

The government is not required to show that the defendant actually displayed or fired the firearm.

United States v. White, 81 F.3d 80, 83 (8th Cir. 1996); 36.20 Devitt, Blackmar and O'Malley [Modified]; United States v. Anderson, 881 F.2d 1128, 1140-41 (D.C. Cir. 1989) and Fifth Circuit Model Instructions, Section 2.45

*Hereen*

*2/26/98*

*E. Arthur Webber*

*U.S.D.J.*

361

# APPENDIX G

## LABORATORY REPORT

RE: Richard HEFLIN, JR.
204 Sandra Dr.           :VICTIM

Norris HOLDER
5607 Curry               :SUSPECTS

Billy ALLEN

FATAL SHOOTING,
3-17-97

COMPLAINT NO.:   97-3 4 2 8 4

REQUEST REC'D:   3-18-97

REPORT DATE:     6-5-97

LABORATORY NO.:  7 0 3 3 6 0

EXAMINER:        DONNA BECHERER

EXAMINED FOR:    Homicide Section
                 Det. Toretta
                 U.S. Attorney
                 Joe Landolt

### REPORT

SPECIMENS:

- Q-4.   Blood from white strap
- K-1.   Blood of Richard Heflin, Jr.
- K-2.   Blood of Billie Allen

RESULTS OF EXAMINATION:

Deoxyribonucleic acid (DNA) profiles from genetic loci D1S7, D2S44, D4S139, D5S110, D10S28 and D17S79 were developed from *Hae*III-digested high molecular weight DNA extracted from the above-listed specimens. Based on these results, the DNA detected in the Q-4 white strap stain does not match the DNA of Richard Heflin or Billie Allen, and could not have been contributed by either of these individuals.

### CHAIN OF CUSTODY

| Priest Q-4 | to | Vincent 3-17-97 | to | Owens 3-17-97 | to | Becherer 3-21-97 | | |
|---|---|---|---|---|---|---|---|---|
| Graham K-1 | to | Barry 3-18-97 | to | Karr 3-18-97 | to | Owens 3-18-97 | to | Becherer 3-21-97 |
| Crow K-2 3-18-97 | to | Becherer 3-21-97 | | | | | | |

EXAMINER: _Donna Becherer_
Donna Becherer
Criminalist

EXAMINER: _Kim Gorman_
Kim Gorman
Criminalist

eas



0001266

# APPENDIX H

METROPOLITAN POLICE DEPARTMENT - CITY OF ST. LOUIS

LABORATORY REPORT

RE:  Richard HEFLIN                COMPLAINT NO.:  97-3 4 2 8 4
     6900 Clayton      :VICTIM
                                   DATE RECEIVED:  3-17/3-18 & 3-19-97
     Norris HOLDER
     5607 Curry        :SUSPECT    DATE EXAMINED:  4-3-97

     Billy ALLEN                   LABORATORY NO.:  7 0 3 3 6 0
     3164 Oregon       :SUSPECT
                                   EXAMINER:      JOSEPH STEVENS
     HOMICIDE/BANK ROBBERY,
     3-17-97                       EXAMINED FOR:  Homicide Section
                                                  Det. Nickerson

REPORT

SPECIMENS:

52A

Q-1.  Metal can containing one damp rag.
Q-2.  One metal can containing carpet and debris from behind passenger
      seat of van.  52B
Q-3.  Paper evidence bag containing clothing of suspect Allen consisting
No 52A5   of:  a) gray sweatpants, b) blue sweatpants, c) black, red and
      white pullover shirt.
Q-4.  Paper evidence bag containing clothing of suspect Norris
      consisting of:  a) blue coveralls, b) blue and red "Nautica"
      shirt, c) blue jeans, d) white "bullet proof" vest.
Q-5.  Paper evidence bag containing one black leather jacket recovered
      from front seat of vehicle.
Q-6.  Paper evidence bag containing plastic bag containing one pair of
      very wet leather gloves.

RESULTS OF EXAMINATION:

Q-1.  Gas chromatographic analysis of the head space of Specimen Q-1

      failed to disclose the presence of any petroleum distillates.

Q-2.  Gas chromatographic analysis of the head space of Specimen Q-2

      disclosed the presence of gasoline.

Q-3 through Q-6.  Specimens Q-3 through Q-6 were repackaged by heat

      sealing in Kapak bags.

      Subsequent gas chromatographic analysis of the head spaces inside

      these Kapak bags disclosed the following:

      Q-3.  No petroleum distillates were detected.

      Q-4.  Gasoline detected

      Q-5.  Gasoline detected

      Q-6.  Gasoline detected

0000157

# APPENDIX I

# METROPOLITAN POLICE DEPARTMENT - CITY OF ST. LOUIS
## EVIDENCE TECHNICIANS REPORT

FILE NO. FOR RECORDS DIVISION

COMPLAINT NO. 97-34395

| CONCERNING _Homicide_ | ORIGINAL C.N. 97-34284 | DIVISION REPORTING 452 | DATE OF THIS REPORT 3-17-97 |
|---|---|---|---|
| TYPE OF ORIGINAL REPORT | | | |

DATE AND TIME OF OCCURRENCE 3-17-97

PLACE OF OCCURRENCE 6900 Clayton    DISTRICT 2    LOCATION CODE 1

VICTIM Richard Hefflin

HOME ADDRESS

BUSINESS ADDRESS

| REQUESTING OFFICER Dickerson | DSN 0944 | ASSIGNMENT 421 | REQUESTING CAR 4203 | TIME RECEIVED CALL 1330 | TIME OF ARRIVAL 1350 | TIME COMPLETED 1800 |
|---|---|---|---|---|---|---|

RESPONDING OFFICER(S)    DSN
A. Thomas A. Schulze 2395    B. John Vegan    DSN 6032    RESPONDING UNIT

LATENT PRINT EXAMINATION (X) YES ( ) NO    IF YES, CHECK RESULTS: (X) POS. ( ) NEG.

| NEGS. | LIFTS. | LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|---|---|
| | A1 | Driver Door | 6032 |
| | B | Driver Door | 6032 |
| | C | Inside Rearview Mirror | 6032 |
| | | Veh: Blue 1989 Dodge Station Wagon | |
| | | Mo Lic: FIR-237 | |
| | | Ser # 1B4K5437KX623100 | |

PHYSICAL EVIDENCE SEARCH (X) YES ( ) NO    EVIDENCE SEIZED (X) YES ( ) NO

| DESCRIPTION OF EVIDENCE & LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|
| (1) Winchester Defender 12, Pump Action Shotgun - under Center Assembly seat | 2395 |
| (8) Live Rounds 12g Shotgun - in Shotgun - Latent Fingerprint processing | |
| (1) Damp rag - Laid on Drivers Seat of Vehicle - DNA Testing | |
| (7) Cassette Tapes (1) Auto light (1) Soda Can (1) Soda Cup (1) Auto Book | |
| Cup Holder (1) Piece of Steering Column (1) Piece of Plastic - Floor Board | |
| of Vehicle - Items To Be Processed For Latent Prints. | |

PHOTOGRAPHY (X) YES ( ) NO

| NEGS. | DESCRIPTION & LOCATION OF RECOVERY | OFFICER'S DSN |
|---|---|---|
| 18 | of Vehicle - Inside and out of Lic plate gage | 2395 |
| | | 6032 |

| PHOTO EVIDENCE TO I.D. BY: 6032 | LATENT EVIDENCE TO I.D. BY: 6032 | PHYSICAL EVIDENCE TO LAB BY: 2395 |
|---|---|---|

TECHNICIAN REPORTING Thomas A. Schulze DSN 2395    SUPERVISOR APPROVING Joseph Burns DSN 6078

0000524    PAGE 1 OF 1

# APPENDIX J

91A-SL-181120
SDK/pmw
1

On Monday, March 17, 1997, an anonymous telephone call was received at the St. Louis office of the Federal Bureau of Investigation.  The caller, a black male, advised that he had seen the television news concerning the arrest of Norris Holder in connection with a bank robbery at the Lindell Bank and Trust. The caller advised that he had seen Holder at the North Oaks Bowling Alley in Normandy.  Approximately one week prior, the caller had seen Holder at the bowling alley and heard him talking to an individual known as ▓▓▓▓ about robbing a bank.  The caller advised that both Holder and ▓▓▓▓ frequent the bowling alley.                          D.M.

On March 17, 1997, Special Agents (SAs) Stephen D. Kettner and Michael A. Vick responded to North Oaks Bowl, 101 North Oaks Plaza, near the intersection of Lucas and Hunt and Natural Bridge Roads.  Inquiry in the cocktail lounge and at the billiards center disclosed that ▓▓▓▓▓▓▓▓▓▓ frequents the bowling alley and has been seen in the company of several black males.

The following individuals were particularly helpful and offered to assist in the investigation as necessary:

R.M.

Security Guard ▓▓▓▓▓▓ is a Police Officer at ▓▓▓▓▓ ▓▓▓▓▓▓▓, working secondary employment in uniform at North Oaks Bowl.  ▓▓▓▓ can be contacted at the ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

T.B.

Police Officer ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Department, was off-duty in the cocktail lounge. ▓▓▓▓▓▓▓▓ advised that he frequents the cocktail lounge, had seen ▓▓▓▓ there and would attempt to identify any associates seen with ▓▓▓▓. ▓▓▓▓ can be contacted at the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

(w) 084pmw02.ins

0000671

# APPENDIX K

91A-SL-181120
JRH:aep

1

The following is a transcript of radio traffic between St. Louis Police Department officers and dispatch re investigation and arrest of subjects on March 17, 1997.

| | |
|---|---|
| U/M: | Yeah, I have an emergency call (?), I'll go over to Euclid by the Metrolink, the subject might be heading over there. They talked to him; they said his van caught on fire, and he was heading for the Metrolink on Euclid Avenue. And advise the Metrolink officers check the Metrolink trains uh (UI). |
| Dispatcher: any | That's clear. 9912 be advised I don't have cars in service in the 9th. |
| U/M: | Go on 26, he's up here, and he's heading down to Metrolink. I'm heading down there now. |
| U/F: | Clear 924. |
| Dispatcher: | Clear 924. |
| U/F: | Be advised that I'm 72 at the Metrolink right now, and uh I don't see any subject matching the description. |
| Dispatcher: | 6248 |
| U/M: | We've got information from workers that they caught the guy he's said his van caught on fire and he's heading towards the Metrolink supposedly on Euclid Avenue. He could've went anywhere though. |
| U/F: | Wearing gray sweatpants and possibly a multi-colored plaid shirt. |
| Dispatcher: | Clear. |
| U/M: | Dispatcher ask the woman.... |
| U/F: | Be advised the super....... |

174AEP08.OTH(W)

91A-SL-181120
JRH:aep

2

| U/M: | 525 |
|---|---|

U/M;    It's right across the street, the highway following the subject west of the yard here.

Dispatcher:    That's clear, all.... Attention all cars.
Second    subject wanted for the robbery and assault 1st from, 6900 Clayton, be advised the subject is a black male.   Attention all cars be advised the subject wanted for the bank robbery.  Supposedly, he's on North Euclid at this time going towards the Metrolink.  His van caught on fire and is disabled.  Time is 11:04.

U/M:    6207

Dispatcher:    1911

U/M:    911

Dispatcher:    Do you have description of him?

#911:    The only thing I was told Dispatcher is a black male with a plaid or multi-colored shirt.  And he was last seen up around the area directly across from the old uh....

U/M:    912

Dispatcher:    Across from where?

#911:    From the arena inside the fence area at the uh City uh Parks Division, on the uh north side of Highway 40 there.

Dispatcher:    That's clear, go ahead 912.

#912:    Clear, uh where you guys; I got Officer Zuick (phonetic) with me, he talked to one of the workers up there.  This uh subject supposedly talked to the guards, and his van caught on fire, and he going to ask for the closest Metrolink station, and he headed that direction.  Now, he is a black male with a uh gray sweatpants and a multi-colored plaid shirt; is all we have right now.  And, that's

0000662

91A-SL-181120
JRH:aep

3

|  | where the information comes from Officer Zuick. |
|---|---|
|  | (Asks Officer Zuick) What car are you in? |
| Zuick: | 226 |
| #912: | He's in car 226.  I have him in my car now. |
| Dispatcher: | That's clear.  And 912 relative. |
| U/M: | 912 |
| Dispatcher: uh | For the location that 911 is gonna be correct he's headed toward the Metrolink right there across uh from the old city arena. |
| U/M: | I don't know Dispatcher, this (UI)....... we got.  So why don't you advise second district where we got it from and Officer Zuick when we talked to see uh workers.  He crawled underneath the fence, and his van caught on fire.  And he started to ask for the closest Metrolink station; that's where he headed towards. |
| Dispatcher: | That's whe... |
| U/M: | Just advise the uh second (UI) that's where we got the information from.  I got Officers Zuick and 226 is with me. |
| Dispatcher: | That's clear.  I'm aware of that.  I'm just trying to find out where was he at exactly when he talked with the guards, the address... |
| U/M: | He was in that yard at 6900 Clayton, and he talked to the not the he talked to one of the workers when he, he saw him crawling underneath the fence, and he asked which way was the closest Metrolink station.  That's where we got the information from.  And, we don't know if he went that way, but that what he asked and that's the way he headed. |
| Dispatcher: | That's clear.  I'll give this to the Second |

000C0CG2

91A-SL-181120
JRH:aep

4

District, 6900 Clayton.

U/M: Yeah, workers at that compound there told Officer Zuick that so we're in the area and that's where the information came from.

Dispatcher: just   Right, that's clear, I'm aware of that.   I'm getting ready to put it out so the Detectives and all the cars will know the last information.

Attention all cars.  Relative to the bank robbery subject, from 1226 received information from a guard in the 5900 block of Clayton that the subject was last seen crawling under a fence; he asked where's the nearest Metrolink.  He's a black male, having on a gray sweatsuit, a multi-colored, gray pants, sweatpants and having on a multi-colored jacket.  This is from 912, time is 1107.

U/M: 923

Dispatcher: 923

#923: You can make the last 95 and I'll be by...

Dispatcher: Cars 95 at 1108 in the area of the Metrolink.

U/M: Gonna be by the Metro..

U/F: Attention all cars.  From 1500 this subject will also have a injured right hand and some hair that was singed.  That black male wanted for the shooting at the bank, 1108.

U/M: 223 - I'm here by the Metrolink on Scott.

U/F: .....1500, he has information from a witness stating this black male in the gray sweatpants and multi-colored jacket will have an injured right hand and singed hair, at 1108.

Dispatcher: 923 I'm clear that you'll be by the Metrolink

0000664

91A-SL-181120
JRH:aep

5

| | |
|---|---|
| on | Scott, at 1109.  926 go ahead. |
| U/M: | 26 I'm gonna on be on foot in the planetarium. |
| U/M: | 6227 |
| Dispatcher: | 926 I show you on foot in the planetarium area at uh... |
| | Attention all cars.  Additional information on the suspect still at large relative to the bank robbery and also a sub first.  The black male subject wearing a multi-colored jacket, gray sweatpants, be advised from 6123 the subject was possibly wearing a full body armor suit.  That's a full body armor suit, possibly has an injury on the right hand from the vehicle fire.  1109's the time. |
| Dispatcher: last | 6227 you were cut out, could you repeat your please. |
| U/F: | .......gray sweatpants, multi-colored jacket.... |
| #6227: | We were advised by a jogger right by Steinberg lane that....... |
| U/F: | ........a fence, uh witnesses say he was on fire at the time. |
| Dispatcher: advised | Go ahead, you were just cut out, you were by a jogger by Steinberg's Skating Rink. |
| U/M: | 724, what's his exact location? |
| U/F: | That's uh Euclid Metrolink Station. |
| Dispatcher: | 6227 |
| U/M: | 6348, there's plenty help. |
| Dispatcher: | 6227 |
| #6227: | 27 |

00C0665

91A-SL-181120
JRH:aep

6

| | |
|---|---|
| Dispatcher: uh as | Be advised your transmission cut out as you, soon as started to speak about the jogger, by Steinberg informed you of what? |
| #6227: | Subject matching that description heading north and east like up towards Kingshighway from the bike path. |
| Dispatcher: informed by | Attention all cars.  From 6227 he was a jogger inside of Forest Park by the Steinberg's Skating Rink that that subject fitting that description was last seen going north and east towards the bike path towards Kingshighway.  Attention all cars from 6227 he was advised by a jogger by Steinberg's Skating Rink that that subject fitting the description was last seen going north and east towards Kingshighway towards the bikepath.  Time is 1112. |

And all cars and the clothing on that suspect is black male, blue correction gray sweatpants, a multi-colored jacket, he possibly has a right hand injury, singed hair.

(RECORDING - THIS CONCLUDES THE TAPE)

0000666

# APPENDIX L

*Alibi*

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog___ , On _02/02/1998_ , Page ___19___

| | |
|---|---|
| Shegog: | Uh...east St. Louis. |
| Swenson: | East St. Louis? |
| Shegog: | Yeah. |
| Swenson: | You recall what time you left home that day? |
| Shegog: | I leave...say about...about nine-thirty, something like that... yeah about nine-thirty. |
| Swenson: | Did ya, did ya have any other stops before you went? |
| Shegog: | Uhhhhh.....no.  Nope. |
| Swenson: | Had, had you been at the mall awile before you saw him? |
| Shegog: | I walked in, when I walked in he was with a group there, right there. |
| Swenson: | Okay, but it doesn't take you that long if you left your, your house at nine-thirty, it doesn't take you that long to drive over to Northwest Plaza though does it? |
| Shegog: | It takes me about thirty, forty, thirty, forty minutes, depends on, ya know, where you staying in St. Louis. |
| Swenson: | Right.  So you think it takes about forty |

0002192

FD-302a (Rev. 8-29-85)

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog___, On __02/02/1998__, Page ___20___

|  |  |
|---|---|
|  | minutes or so from your house, thirty to forty minutes? Okay. But you don't think there's anyway you saw him before eleven? |
| Shegog: | Uh hmmm, uh hmmm. |
| Swenson: | When you left you went to, you drove him to his girlfriend's house somewhere off of Bermuda. |
| Shegog: | Uh hmmm. |
| Swenson: | How close to the highway was that? |
| Shegog: | Right off the highway. |
| Swenson: | Right off the highway. You recall her name? |
| Shegog: | He didn't never tell me her name. |
| Swenson: | Never told ya? Okay, so you... |
| Shegog: | He uh, I guess he had two girlfriends, I don't know, there was one at Bermuda ...(UI)...and the one...the house he was over with. |
| Swenson: | Oh, okay. |
| Shegog: | So, I know they weren't the same girl. |
| Swenson: | Had, had you met these girls before. Did you know anything about them? |
| Shegog: | I hadn't seen Billy in a long time. |

0002193

FD-302a (Rev. 10-6-95)

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog___ , On _02/02/1998_ , Page ___21___

| | |
|---|---|
| Swenson: | You weren't really close enough to Billy that you know, to know that kind of stuff about him. |
| Shegog: | The only dealings I had with him was with his sister that was it. |
| Swenson: | Okay.  When you uh, when you dropped him off at his sister's house or his girlfriend's house, you waited in the car.  How, earlier you said about fifteen minutes?  Is that? |
| Shegog: | He went in about five, five. |
| Swenson: | Five minutes, okay, I'm sorry you said about fifteen minutes about your, your check, okay.  Uh, you say about five minutes, you think? |
| Shegog: | Five to ten, yeah. |
| Swenson: | Okay, did he take anything in?  Did he bring anything out? |
| Shegog: | He said he had to drop some money off to her. |
| Swenson: | Said he had to drop some money off? |
| Shegog: | Uh hmmm. |
| Swenson: | Okay.  Did he buy anything in Northwest Plaza that you saw.  Did he have any bags or...? |
| Shegog: | He had some bags, uh huh, not sure what kinda |

0002194

91A-SL-181120

Continuation of FD-302 of ___P.Swenson/D.Rice/Christopher Shegog__, On _02/02/1998_, Page ___22___

|  |  |
|---|---|
|  | bags they was, uh, but he had like two or three. It was large bags. |
| Swenson: | Okay. |
| Shegog: | Uh...that's, I remembered it then, when I went to St. Clair Square he bought uh...two, some more clothes out of there. |
| Swenson: | Okay. |
| Shegog: | Ya know, 'cause I thought maybe he just, ya know, dirty money...(laughing)...it was dirty money, ya know, I was saying... |
| Swenson: | Diff...different kind maybe? |
| Shegog: | Yeah. |
| Swenson: | So he had, he had two or three bags with him when he left, when you first saw him at the mall? |
| Shegog: | Uh hmmm. |
| Swenson: | At Northwest Plaza? |
| Shegog: | Shoes...shoe bags. |
| Swenson: | Shoe bags. |
| Shegog: | Yeah, shoe bags, some kind of clothes bag. |
| Swenson: | But he didn't really discuss with you what he bought? |

0002195

# APPENDIX M

*Sindel, Sindel & Noble, P.C.*

ATTORNEYS & COUNSELORS AT LAW

8000 MARYLAND AVE. - SUITE 350

CLAYTON, MISSOURI 63105

RICHARD H. SINDEL
CHARLES D. SINDEL
TRAVIS L. NOBLE, JR.

STEPHANIE HOWLETT
KATHRYN B. PARISH
JOSHUA C. SINDEL
DANIEL J. NOLAN

(314) 721-6040
FAX (314) 721-8545
www.sindellaw.com

WILLIAM F. SINDEL
1933-1991

TEBBS P. FORGEY, JR.
1936-1967

RICHARD H. SINDEL
cell (314) 799-7045
rsindel@sindellaw.com

September 9, 2014

Billie Allen #26901-044
USP Terre Haute
PO 33
Terre Haute, IN 47808

LEGAL MAIL
ATTORNEY-CLIENT
PRIVILEGE

> Re:  Billie Jerome Allen v. United States
>       Cause No: 4:07-CV-27-ERW

Dear Billie:

I have received your most recent letter concerning the questions that you would like me to answer. Unfortunately, I do not believe that it would be appropriate for me to correspond with you as long as you are represented by an attorney. I have sent a copy of the letter to your attorney with what I anticipate my answers would have been.

Good luck to you.

Very truly yours,

Richard H. Sindel

RHS:dd



SINDEL, SINDEL & NOBLE

Exhibit 2

*Sindel, Sindel & Noble, P.C.*

ATTORNEYS & COUNSELORS AT LAW

8000 MARYLAND AVE. - SUITE 350

CLAYTON, MISSOURI 63105

RICHARD H. SINDEL
CHARLES D. SINDEL
TRAVIS L. NOBLE, JR.

STEPHANIE HOWLETT
KATHRYN B. PARISH
JOSHUA C. SINDEL
DANIEL J. NOLAN

(314) 721-6040
FAX (314) 721-8545
www.sindellaw.com

WILLIAM F. SINDEL
1933-1991
TEBBS P. FORGEY, JR.
1936-1967

RICHARD H. SINDEL
cell (314) 799-7045
rsindel@sindellaw.com

July 21, 2014

Timothy Kane
Assistant Federal Defender
*sent via email: timothy_kane@fd.org*

In Re:  Billie Allen

Dear Tim:

Attached is the letter Billie sent me.  I have not sent him answers to the questions, but if I had they would have been:

1.    Yes
2.    Yes
3.    Yes
4.    Yes
5.    I do not understand the question
6.    Yes.

Please call with any questions.

Very truly yours,

Richard H. Sindel.

RHS:dd
Attachment



Exhibit 2

Mr. Sindel,                                                    7/1/14

How are you? I'm sure that this letter must come as a surprise, but I'm reaching out to you personally because I need your help.

I'm not sure if you've been keeping up with my case, but just this week, the Court turned down my appeal; putting me one more step closer to death's door. (A fate that I believe you don't want me to share.)

I'm writing because some facts and evidence in my case have developed / come to my attention and I was wondering if you could tell me if any of the facts and/or evidence would've been used by you or investigated, before or at trial, had you known about them?

As you and I both know, getting a hearing on guilt issues or receiving a new trial is a hard, if

Exhibit 2

not almost impossible task because of the roadblocks put up by the Courts. But if I can show that you would've done something different, or investigated facts of the case, or evidence, had you known about them at trial; it would better my chances at saving my life with a new trial or hearing.

—— I'm in no way asking for you to lie for me or say things just to save my life. I only want your true answers to some of the questions I have. I'm also in no way trying to make you look bad, just to save my life. I just want your honest answers and/or opinions...

1) Before and/or during my trial, if you had known that the government discovered traces of DNA at the crime scene, and after testing, the results excluded me and the victim; would you have investigated this evidence further and/or presented the results to my jury to establish reasonable doubt?

2) Before and/or during my trial, if you had known that the government was in possession of recordings

Exhibit 2

of witnesses, who were at the crime scene; would you have wanted those recordings in determining what to present on my behalf and/or to use in cross examining the witnesses; being that witnesses stories would change at trial from what was in their police or F.B.I. 302 forms?

3) Before and/or during my trial, had you known that the government would test my clothes for traces of gasoline, (in hopes of linking me to the crime), but the results would later exclude my clothes for traces of gasoline; would you have investigated this further or presented this to my jury to establish reasonable doubt?

4) Before and/or during my trial, had you known that officers lied about Henderson and I knowing each other from the Marquise murder and evidence could prove the lie; would you have investigated this evidence and/or presented it to impeach the witnesses?

5) Before and/or during my trial, had you known

the government planned to use charges in my indictment to establish motive (and other things). and the charges would later be ~~revealed~~ revealed to be done by someone else; would you have investigated these facts, kept them from being heard by my jury, or had them removed from the record. all together?

6) Before and/or during my trial, had you known that someone name Jerry Bostic or (EJB) could be linked to the DNA found at the crime scenes and that he had possible links to the planning and possibly the crime; would you have investigated him and/or presented him as a witness, or ask for testing to link him to the crime?

I also plan to ask John the same questions and to hopefully use the answers in my C.O.A. filing. With the evidence that has come to my attention,

Exhibit 2

I believe that if I'm correct; you would've investigated and presented the things I've mentioned. One can't overlook how strong these things are and how they would've changed a lot!

Thanks for your time and I hope that you can help me by answering these questions.

Take Care,

Billie Allen

26901-044

P.O. BOX 33

Terre Haute, IN,

47808

P.S. Can you make a copy of this letter with your answers?

# APPENDIX N



St. Louis police officer Thomas A. Carroll in a 2014 image. Photo by J.B. Forbes, jforbes@post-dispatch.com

**ST. LOUIS** • Deputy U.S. marshals led a former St. Louis police detective from federal court here in handcuffs Wednesday after he admitted beating a shackled suspect who had been found with the ex-officer's daughter's stolen credit card.

In pleading guilty of a felony charge of depriving someone of his civil rights, Thomas A. Carroll, 52, said he threatened Michael Waller, who was arrested July 22, 2014, at Ballpark Village. Carroll said he attacked Waller at a police station after a boss warned Carroll to stay away.

After Assistant U.S. Attorney Fara Gold described details of the crime, U.S. District Judge Henry Autrey asked Carroll if they were true.

"They're substantially correct," he said.

Carroll disputes prosecutors' claims that he stuck a pistol in Waller's mouth and threatened him. The former officer also denies "obstructive behavior" after the incident, and disputes any claims that Waller was seriously injured. If proved at his sentencing hearing, those factors could add years to a prison term.

Prosecutors think Carroll should face seven to nine years, defense attorney Neil Bruntrager said, but without sentencing enhancements it would be 15 to 21 months. The July 7 sentencing hearing has the potential to turn into a mini-trial, with each side presenting its version of events.

After the hearing, prosecutors declined to comment.

Bruntrager described Carroll as a "highly decorated officer" who "did things the right way."

He said that Carroll's daughter's purse, wallet and ID were among items stolen from her car two days before her wedding.

"It's not an excuse, but it's an explanation," Bruntrager said. "People can't lose sight (that) ... these guys are human."

http://www.stltoday.com/news/local/crime-and-courts/former-st-louis-cop-pleads-guilty-of...   4/13/2016

# APPENDIX O

# The Washington Post

*Democracy Dies in Darkness*

# To win a murder conviction, police and prosecutors made up evidence and secretly paid a witness, St. Louis DA finds

By **Meagan Flynn**

July 26, 2019 at 6:10 a.m. CDT

The state's theory stretched the physical limits of the human body. Somehow on the night of Oct. 30, 1994, Lamar Johnson left his friend's apartment, traveled three miles to Marcus Boyd's front porch with one other man, killed Boyd, fled on foot and arrived back at the apartment to continue socializing with friends — all in "no more than five minutes."

Now, the St. Louis Circuit Attorney's Office says it knows how prosecutors managed to convince a jury it was true: Police and prosecutors made up the evidence, according to a 67-page motion seeking to vacate Johnson's first-degree murder conviction and grant him a new trial after 24 years behind bars.

The accompanying investigative report, made public this week, describes a staggering amount of misconduct on the part of homicide detectives and prosecutors that convicted Johnson and sent him to prison for life with no possibility of parole.

Not only did detectives write police reports containing invented statements from witnesses, the report found, but the St. Louis Circuit Attorney's Office also made secret payments to the single eyewitness, who was pressured into making the false identification that would ultimately seal Johnson's fate, according to the report.

And authorities did all of this, investigators found, in the face of "overwhelming" evidence that Johnson was an innocent man. He has insisted on his innocence the entire time he has been behind bars.

"The violation of Johnson's constitutional rights enabled the State of Missouri to obtain a conviction and sentence of life without the possibility of parole against Johnson despite overwhelming evidence of innocence," the circuit attorney's office wrote. "The undisclosed secret payments to the sole eyewitness in a case that was undeniably thin fatally undermines the reliability of the verdict."

AD

The case is a striking example of how serious misconduct by law enforcement can be brought to the surface by a conviction integrity unit, which progressive district attorney's offices across the country have set up to investigate potential wrongful convictions. In this case, St. Louis Circuit Attorney Kim Gardner created the unit with the help of a federal grant in December and in partnership with the Midwest Innocence Project, which had already been working on Johnson's case since 2008.

In the report, the unit describes the evolution of the police investigation as "a series of circumstances that are alarming and offend the most basic notions of fairness and justice." By contrast, the trial prosecutor, Dwight Warren, who is no longer with the office, described the report as "nonsense," the St. Louis Post-Dispatch reported.

The investigation into Johnson's case found that a single homicide detective, Joseph Nickerson, authored four false police reports describing possible motives for Johnson to kill Boyd, such as that Johnson had a drug beef with Boyd. Years later, all four witnesses would review the reports and swear under oath that they never said what Nickerson attributed to them. The only eyewitness, Greg Elking, failed to identify Johnson several times before pointing to him at trial. He would be paid more than $4,000 for his cooperation — payments not discovered until the CIU's investigation in 2019.

AD

The men actually responsible for killing Boyd in a botched robbery would reveal themselves much sooner. They confessed as early as 1996 and 2002, saying in sworn affidavits that Johnson was not involved. Johnson continued to languish in prison anyway.

"I know Lamar Johnson is innocent of that crime because I was there and Lamar Johnson was not there," the confessed shooter, James Howard, stated 17 years ago.

The homicide investigation seemed poisoned from the start, investigators found. Before police even interviewed the sole eyewitness, police already wrote down the name of a prime suspect: Johnson. The intel appeared based on little more than a hunch from the victim's girlfriend. She had told police she couldn't see the killers' faces: They were wearing ski masks.

AD

Around 9 p.m. the night of the shooting, they had ambushed the porch where Boyd was sitting with Elking, who had come to pay a small drug debt. Presented with a photo array of suspects, Elking told Nickerson he never saw the shooters' faces either. But Nickerson told him that if he cooperated as a witness, the state would help his family financially. Elking agreed.

He did not positively identify Johnson, saying only that his eyes looked "familiar."
In the police report, however, Nickerson wrote that Elking did identify him — a fabrication he used to support an arrest warrant for Johnson, the investigation found.

Immediately after his arrest, Johnson explained his alibi to Nickerson, insisting he was with his girlfriend at their friend's apartment and that there were phone records to prove it. Curiously, a second detective, Ralph Campbell, interviewed Johnson just minutes after Nickerson and claimed in a police report that Johnson made a cryptic confession, claiming Johnson said he "let the white guy live," in reference to Elking. The conviction integrity unit believes this confession was fabricated too.

AD

"The CIU does not believe that Johnson volunteered a confession to Detective Campbell after he denied involvement at arrest, during questioning, throughout trial, and for the twenty-four years thereafter," prosecutors wrote.

Police never investigated his alibi, the investigation found. Instead, they put him in a photo lineup and hauled Elking in to ID him. On the way to the station, Nickerson told him that Johnson was believed to be responsible for a number of unsolved homicides in the city, and so Elking's cooperation was "critical to providing justice for Boyd and his family," according to the report.

Elking failed three times to identify Johnson.

AD

And yet still, this was not the end of Elking's cooperation. In the elevator, police wrote in a report, Elking confided in Nickerson that he "wanted to do the right thing" but that he was "scared" and "needed time to think about what I should do." The police report states that Elking then admitted he "lied" about the previous wrong identifications, and now was ready to make the right ID. He allegedly then chose Johnson and Phil Campbell, the co-defendant who confessed.

Years later, first in a confessional to his pastor and then to prosecutors, Elking would explain that Nickerson gave him the answers — and that he went along out of fear, a guilt that weighed on his conscience until 2003, when he told his pastor he had to lift it.

"I regret not coming to you or anyone else sooner," he wrote. "I don't believe it was the right thing to do then & more so now."

AD

On Elking's false ID alone, bolstered by Nickerson's false reports from witnesses on a possible motive and a jailhouse informant who had incentive to lie, a jury convicted Johnson in July 1995. Remarkably, prosecutors did not dispute his alibi. They simply argued that, in the five minutes Johnson left the apartment, he had time to travel three miles to Boyd's home to kill him and then come back.

Despite all of this, Johnson lost at least six appeals in state and federal courts — even when Johnson presented the two sworn affidavits from the confessed killers.

Part of the problem was that St. Louis Circuit Attorney and St. Louis Police Department continued to block him from obtaining information. When he filed an open records request in 2009 seeking any payments the circuit attorney or police department made to witnesses, he was told there were no records.

In fact, the conviction integrity unit found 63 pages of information about the secret arrangement plus a handwritten ledger describing more than a dozen payments totaling $4,241, apparently to fund housing and moving expenses. The payments began on Nov. 4, 1994 — five days after the shooting and the very first day Nickerson interviewed Elking.

"The documentation in the State's file describes Elking as an "essential witness" and the CIU agrees," prosecutors wrote in the investigative report. "Without Elking, there was no case against Johnson."

The St. Louis Metropolitan Police Department did not immediately respond to a request for comment. Attempts to reach Nickerson and Warren were unsuccessful.

The motion for a new trial filed Monday makes clear that prosecutors consider Johnson an innocent man and do not intend to retry Johnson for murder should a judge grant the motion.

The unit said it tracked down some of the old jurors in Johnson's case, presenting them with the findings. All of them said they would have never convicted them, had they known the facts.

On Tuesday, the Midwest Innocence Project said in a statement that it "praises Circuit Attorney Gardner and the CIU for their work to correct an injustice."

After more than twenty years," said Tricia Bushnell, executive director of the Midwest Innocence Project, "the system is finally being held accountable for its failures in Lamar Johnson's case."

**More from Morning Mix:**

After a girl vanished in 1984, Ronald Reagan pleaded for help. Her body was finally found.

Ole Miss frat brothers brought guns to an Emmett Till memorial. They're not the first.